No. 19-2211

# In the United States Court of Appeals for the Federal Circuit

---

BRUCE R. TAYLOR, CLAIMANT–APPELLANT,

*v.*

DENIS MCDONOUGH, SECRETARY OF VETERANS AFFAIRS, RESPONDENT–APPELLEE.

---

*Appeal from the United States Court of Appeals for Veterans Claims in Vet. App. No. 17-2390, Judge William S. Greenberg, Judge Amanda L. Meredith, and Judge Joseph L. Falvey, Jr.*

---

## EN BANC BRIEF OF CLAIMANT–APPELLANT

---

MARK B. JONES*
MARK B. JONES ATTORNEY AT LAW
 *1203 Michigan Street*
 *Sandpoint, Id 83864*
 *Phone: (208) 263-0886*
 *E-mail: thessaguy@hotmail.com*
 *\*Entry of Appearance Forthcoming*

LIAM J. MONTGOMERY
CHARLES L. MCCLOUD
ANNA HROM
TIMOTHY PELLEGRINO
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *Phone: (202) 434-5030*
 *E-mail: LMontgomery@wc.com*

*Attorneys for Claimant–Appellant*

## **CERTIFICATE OF INTEREST**

Pursuant to Federal Circuit Rule 47.4, undersigned counsel for Appellant Bruce R. Taylor certifies the following:

1.    The full name of the party represented by me is Bruce R. Taylor.

2.    The name of the real party in interest represented by me is the same.

3.    There are no parent corporations or any publicly held companies that own 10% or more of stock in any party.

4.    All attorneys that appeared for Appellant below intend to file a notice of appearance in the case.

5.    There are no pending cases that will be directly affected by the current appeal.

6.    This case is not a bankruptcy case. *See* Fed. R. App. P. 26.1.


SEPTEMBER 20, 2021                                   */s/ Liam J. Montgomery*
                                                    LIAM J. MONTGOMERY

i

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ...................................................1
STATEMENT OF JURISDICTION .......................................................1
PRELIMINARY STATEMENT..............................................................1
STATEMENT OF THE ISSUES ...........................................................4
STATEMENT OF THE CASE ...............................................................4
    A.    For two decades, the United States tested chemical warfare agents on human beings at Edgewood Arsenal. ..............6
    B.    At the height of the Vietnam War, Mr. Taylor volunteered to serve his country, including by volunteering for the Edgewood human testing program. .................................8
    C.    The Army violated its own regulations that, among other things, required it to provide adequate treatment to Edgewood human test subjects....................................12
    D.    The executive branch used its own misconduct to thwart access to Congress's duly appropriated veterans' benefits. ........14
SUMMARY OF ARGUMENT ..............................................................17
ARGUMENT .......................................................................................20
I.    The Court should estop the executive from thwarting Congress's intent by depriving Mr. Taylor of the earlier effective date he is due. ....................................................................................20
    A.    Courts are empowered to equitably estop the government in cases of affirmative misconduct. ...................................20
    B.    Arguments against estoppel are meritless. ...................25
        1.    The Veterans Court has inherent authority to apply equitable estoppel. .................................................25
        2.    The Appropriations Clause does not bar equitable estoppel in this case. ..............................................30
            a.    *Richmond* does not support the government's position.........................................................31
            b.    *McCay* does not support the government's position.........................................................41
            c.    In the alternative, the Court should clarify *McCay*.........................................................45
    C.    The executive's position violates the Veterans' Canon.................47

II.    The executive's conduct violates Mr. Taylor's constitutional right
       of access to the courts and administrative processes............................49
       A.    The executive branch violated Mr. Taylor's right of access
             to VA processes and the courts by precluding him from
             filing for benefits. ..............................................................................50
       B.    The executive also violated Mr. Taylor's right of access
             under the standards articulated in incarcerated persons
             cases..................................................................................................55
       C.    No compelling government interest justifies the executive's
             violation of Mr. Taylor's right of access. ........................................58
       D.    The effective-date provisions of 38 U.S.C. § 5110(a) must
             yield to Mr. Taylor's constitutional rights......................................61
CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................65

# TABLE OF AUTHORITIES

Page

## CASES

*AF v. Nicholson*, 168 F. App'x 406 (Fed. Cir. 2006) ..........................................40

*Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731 (1983) ....................52, 54, 62

*Bokum v. Comm'r of Internal Revenue*, 992 F.2d 1136 (11th Cir. 1993)........28

*Boumediene v. Bush*, 553 U.S. 723 (2008)......................................................24, 60

*Brown v. Gardner,* 513 U.S. 115 (1994).................................................................48

*Brush v. Off. of Pers. Mgmt.*, 982 F.2d 1554 (Fed. Cir. 1992)...............34, 35, 47

*Buesing v. United States*, 42 Fed. Cl. 679 (1999)...............................................28

*Burnside-Ott Aviation Training Ctr., Inc. v. United States*,
    985 F.2d 1574 (Fed. Cir. 1993) .....................................................................33, 47

*Burris v. Wilkie*, 888 F.3d 1352 (Fed. Cir. 2018) ....................................28, 29, 30

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) .............51

*Cann v. Carpenters Pension Tr. for S. Cal.*,
    662 F. Supp. 501 (C.D. Cal. 1987) .......................................................................28

*Chambers v. Balt. & Ohio R.R. Co.*, 207 U.S. 142 (1907) ............................51, 59

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)........................61

*Cushman v. Shinseki*, 576 F.3d 1290 (Fed. Cir. 2009) ......................................49

*Defy Ventures, Inc. v. U.S. Small Bus. Admin.*,
    469 F. Supp. 3d 459 (D. Md. 2020) ......................................................................33

*Delew v. Wagner*, 143 F.3d 1219 (9th Cir. 1998) ...............................................50

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)......................................................................................52, 54, 62

*Euzebio v. McDonough*, 989 F.3d 1305 (Fed. Cir. 2021).....................................20

*Ex parte Hull*, 312 U.S. 546 (1941) ......................................................51, 62, 63, 65

*Fano v. O'Neill,* 806 F.2d 1262 (5th Cir. 1987) .........................................22, 23, 25

*FDIC v. Hulsey*, 22 F.3d 1472 (10th Cir. 1994) .......................................34, 46, 47

*Fitzgerald Truck Parts & Sales, LLC v. United States*,
    391 F. Supp. 3d 794 (M.D. Tenn. 2019) .......................................................33, 37

iv

Page

Cases—continued:

*Fredericks v. Comm'r of Internal Revenue*, 126 F.3d 433 (3d Cir. 1997) .......22

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) .......................59

*Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231 (1959)...........................20, 21

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
    467 U.S. 51 (1984)...........................................................................20, 21

*Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428 (2011)...........25, 26, 48

*In re Bailey*, 182 F.3d 860 (Fed. Cir. 1999) ........................................27

*In re Kip & Andrea Richards Fam. Farm & Ranch, LLC*,
    613 B.R. 699 (B.A.P. 8th Cir. 2020)....................................................28

*In re Taylor*, No. 08-13 206, slip op. (Bd. Vet. App. Apr. 14, 2017)..................16

*Jackson v. Procunier*, 789 F.2d 307 (5th Cir. 1986).......................................56

*James v. Wilkie*, 917 F.3d 1368 (Fed. Cir. 2019)...............................................27

*John L. v. Adams*, 969 F.2d 228 (6th Cir. 1992) ..............................................56

*Johnson v. Avery*, 393 U.S. 483 (1969) ........................................................63, 65

*King v. St. Vincent's Hosp.*, 502 U.S. 215 (1991)..............................................48

*Lewis v. Casey*, 518 U.S. 343 (1996)......................................................50, 51, 55, 64

*Lofton v. West*, 198 F.3d 846 (Fed. Cir. 1999) ..................................................27

*Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356 (Fed. Cir. 2011) ........21

*Martin v. O'Rourke*, 891 F.3d 1338 (Fed. Cir. 2018)...................................27, 34

*McCay v. Brown*, 106 F.3d 1577 (Fed. Cir. 1997) ...................................*passim*

*McCay v. Brown*, 9 Vet. App. 183 (1996)....................................................43, 44

*Minerva Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298 (2021).......................27

*Monk v. Shulkin*, 855 F.3d 1312 (Fed. Cir. 2017) .............................................27

*Montana v. Kennedy*, 366 U.S. 308 (1961).................................................25, 43

*NLRB v Noel Canning*, 573 U.S. 513 (2014) ....................................................38

*NAACP v. Button*, 371 U.S. 415 (1963) ........................................................58, 62

*Nordgren v. Milliken*, 762 F.2d 851 (10th Cir. 1985) .......................................50

Page

Cases—continued:

*Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990) .............................*passim*

*Padgett v. Nicholson*, 473 F.3d 1364 (Fed. Cir. 2007) .......................................27

*Pennsylvania v. Finley*, 481 U.S. 551 (1987) .......................................................51

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014) ........................39

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)....................................................61

*Rosenberg v. Mansfield*, 22 Vet. App. 1 (2007)....................................................29

*Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361 (Fed. Cir. 2003).......21

*Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983)................................................58

*Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012).................................35

*Schwebel v. Crandall*, 967 F.3d 96 (2d Cir. 2020)..............................................26

*Servello v. Derwinski*, 3 Vet. App. 196 (1992) ...................................................29

*Shinseki v. Sanders*, 556 U.S. 396 (2009)...........................................................48

*Silva v. Di Vittorio*, 658 F.3d 1090 (9th Cir. 2011)................................55, 56, 58

*Simkins v. Bruce*, 406 F.3d 1239 (10th Cir. 2005)......................................57, 58

*Snyder v. Nolen*, 380 F.3d 279 (7th Cir. 2004)...................................................56

*Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997) ...................50, 58

*Taylor v. McDonough*, 3 F.4th 1351 (Fed. Cir. 2021) ...........................1, 17, 24

*Taylor v. McDonough*, 4 F.4th 1381 (Fed. Cir. 2021) .....................1, 17, 20, 55

*Taylor v. Shinseki*,
    No. 11-0254, 2013 WL 3283487 (Vet. App. June 28, 2013) ..........8, 10, 16, 23

*Taylor v. Wilkie*, 31 Vet. App. 147 (2019) ..................................................*passim*

*Tefel v. Reno*, 180 F.3d 1286 (11th Cir. 1999) ....................................................21

*Turner v. Safley*, 482 U.S. 78 (1987)....................................................................58

*United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965)......52, 54, 62

*United States v. Cox*, 964 F.2d 1431 (4th Cir. 1992) ..........................................33

*United States v. Ga.-Pac. Co.*, 421 F.2d 92 (9th Cir. 1970) ...............................22

Page

Cases—continued:

*USA Petrol. Corp. v. United States*, 821 F.2d 622 (Fed. Cir. 1987)................22

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014).............................37

*Viet. Veterans of Am. v. Cent. Intel. Agency*,
   288 F.R.D. 192 (N.D. Cal. 2012) ....................................54

*Viet. Veterans of Am. v. Cent. Intel. Agency*,
   811 F.3d 1068 (9th Cir. 2016)...................................13, 14

*Viet. Veterans of Am. v. Cent. Intel. Agency*,
   No. C 09-0037 CW, 2013 WL 3855688 (N.D. Cal. July 24, 2013).................6

*Viet. Veterans of Am. v. Cent. Intel. Agency*,
   No. C 09-0037 CW, 2013 WL 6092031 (N.D. Cal. Nov. 19, 2013).......*passim*

*Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) ...........................22, 23, 25

*Wolff v. McDonnell*, 418 U.S. 539 (1974)....................................51

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).......................37

*Zacharin v. United States*, 213 F.3d 1366 (Fed. Cir. 2000).......................21, 46

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012)...........................37

## CONSTITUTION AND STATUTES

U.S. Constitution
   amend. I ...............................................................51
   amend. V ..............................................................51
   art. I, § 9, cl. 7...............................................*passim*
   art. IV................................................................51

Administrative Procedure Act § 706,
   5 U.S.C. § 706 ........................................................26

Sherman Act, 51 Cong. ch. 647, July 2, 1890, 26 Stat. 209 (codified as 15
   U.S.C. § 1 *et seq.*) ...........................................52, 53, 54, 62

National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ................................52, 54

Page

Constitution and Statutes—continued:

Veterans' Judicial Review Act of 1988,
   Pub. L. No. 100-687, 102 Stat. 4105 (codified, as amended, in various
   sections of 38 U.S.C. (2006 ed. and Supp. III)) .......................................25, 48

38 U.S.C.
   § 503............................................................................................................29
   § 1110..........................................................................................................35
   § 5110................................................................................................... *passim*
   § 7252............................................................................................................1
   § 7252(a) ..............................................................................................26, 27
   § 7261..........................................................................................................26
   § 7292............................................................................................................1

Foreign Intelligence Surveillance Act, Pub. L. No. 95-511, 92 Stat. 1783
   (codified at 50 U.S.C. § 1801 *et seq.*) ................................................60

## OTHER AUTHORITIES

Mark Brown, PhD, *Military Chemical Warfare Agent Human
   Subjects Testing: Part 1—History of Six-Decades of Military
   Experiment with Chemical Warfare Agents*, 174 Mil. Med. 1041
   (2009) ...........................................................................................................7

33 Fed. Prac. & Proc. Judicial Review § 8354 (2d ed.) ......................................21

*The Inaugural Address of President Reagan* (Jan. 20, 1981),
   *in* 81 Dep't of State Bulletin, Feb. 1981 ............................................1

Letter from Hon. Reggie B. Walton, Presiding Judge, U.S. Foreign
   Intelligence Surveillance Court, to Hon. Patrick J. Leahy,
   Chairman, Senate Committee on the Judiciary (July 29, 2013),
   https://www.fisc.uscourts.gov/sites/default/files/Leahy.pdf .......................60

S. Rep. No. 94-755 (1976) ..................................................................................8, 63

S. Rep No. 100-418 (1988) ..................................................................................26

*Secrets of Edgewood*, New Yorker (Dec. 21, 2012),
   https://www.newyorker.com/news/news-desk/secrets-of-edgewood............6

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, undersigned counsel certifies that there are no related cases associated with the present appeal.

## STATEMENT OF JURISDICTION

On April 5, 2019, a divided panel of the United States Court of Appeals for Veterans Claims affirmed the denial of Mr. Taylor's claim for an earlier effective date for service-connected disability benefits. *Taylor v. Wilkie*, 31 Vet. App. 147, 149 (2019); *see* 38 U.S.C. § 7252. Mr. Taylor timely appealed that final order on June 28, 2019. A unanimous panel of this Court reversed in a reported decision. *Taylor v. McDonough*, 3 F.4th 1351, 1374 (Fed. Cir. 2021). On July 22, 2021, this Court ordered en banc review pursuant to 28 U.S.C. § 46 and Federal Rule of Appellate Procedure 35(a). *Taylor v. McDonough*, 4 F.4th 1381, 1381 (Fed. Cir. 2021). The Court has jurisdiction pursuant to 38 U.S.C. § 7292.

## PRELIMINARY STATEMENT

The markers in Arlington National Cemetery "add up to only a tiny fraction of the price that has been paid for our freedom."[1] Countless Americans

---

[1] *The Inaugural Address of President Reagan* (Jan. 20, 1981), 81 Dep't of State Bulletin, Feb. 1981.

have taken up arms for this country when their country needed them most. Many of these veterans were irreparably injured during their service. Bruce R. Taylor is one of them.

As a young soldier, Mr. Taylor volunteered to participate in the U.S. government's highly classified testing program at Edgewood Arsenal, Maryland. The Army subjected Mr. Taylor to some of the most hazardous compounds known to man. These exposures resulted in serious and irreparable injuries—injuries that two combat tours in Vietnam further exacerbated.

The executive unquestionably had ethical, moral, and legal obligations to care for Mr. Taylor—in fact, its own regulations said so. But for thirty-five years, the executive threatened Mr. Taylor with criminal prosecution if he discussed his experiences at Edgewood with anyone, including his doctors, the VA, and the courts. Even today—fourteen years after Mr. Taylor started his fight against the VA—the executive asks the Court to endorse the use of such misconduct to thwart Mr. Taylor's access to the benefits Congress appropriated for him and veterans like him.

In the face of such conduct by its co-equal branch of government, the Court must address a simple question: Do the law and the Constitution empower the courts to prevent such unjust conduct? The question answers itself:

Yes. The Constitution and centuries-old equitable doctrines empower this Court to stop the executive from wrongfully abrogating congressional intent.

*First*, equitable estoppel exists to prevent precisely such misconduct. The relief Mr. Taylor seeks is consistent with, not contrary to, Congress's expressed intent in the relevant statutory scheme. And no legal principle stands in the way of this Court or the Veterans Court exercising its equitable powers to check the executive. This is especially true in Mr. Taylor's case given the Supreme Court's longstanding direction that veterans' benefits schemes must be construed in veterans' favor.

*Second*, although these equitable powers have always been at the courts' disposal to check the executive's overreach, Mr. Taylor was not able to access them until he could gain access to the necessary administrative and legal forums. The only reason he could not was, again, the executive itself, which barred Mr. Taylor from petitioning the government and the courts for access to the benefits Congress appropriated for him: For decades, the executive threatened Mr. Taylor's very liberty in order to prevent him from seeking redress. Under any applicable test, this conduct violated Mr. Taylor's constitutional rights.

3

In short, this case presents separation-of-powers issues of the utmost importance. For thirty-five years the executive invaded the province of not just one of its co-equal branches of government, but *both* of them. It failed to allow Mr. Taylor the benefits Congress appropriated him. And it perpetrated that scheme by barring Mr. Taylor's constitutionally-protected access to the court system that could have set things right. The Court should reverse the judgment below.

## STATEMENT OF THE ISSUES

1.      The executive branch used threats of criminal prosecution and dishonorable discharge to prevent Mr. Taylor from receiving benefits Congress appropriated for him and others like him. Can a court equitably estop the executive from invading Congress's province in this manner?

2.      While on the one hand using threats of criminal prosecution to bar Mr. Taylor from available channels to petition the government, the executive on the other hand provided Edgewood veterans no alternative process for relief. Did that scheme violate Mr. Taylor's constitutional right of access to the courts and to related administrative processes?

## STATEMENT OF THE CASE

Mr. Taylor volunteered to serve his country during the Vietnam War

even after his brother died in that same conflict. But before he left for Vietnam, Mr. Taylor volunteered for a highly secretive program at Edgewood Arsenal, Maryland, which subjected human beings to chemical weapons tests. The Army enacted regulations mandating limits on this exceedingly dangerous testing. However, it violated those regulations—and betrayed veterans like Mr. Taylor—in nearly every way imaginable. Because of these experiences, Mr. Taylor has endured years of PTSD and other life-threatening conditions, including a recent cancer diagnosis.

Congress appropriated VA disability benefits for Mr. Taylor. But the executive robbed him of those benefits, first by threatening him with criminal prosecution if he violated his secrecy oath and then by providing no alternative means to access those congressionally mandated benefits.

In 2006, the VA finally did what the executive could have done from the outset: provide a means for Edgewood veterans to apply for benefits. Mr. Taylor promptly sought what Congress had intended him to receive all along. Incredibly, however, the executive asks this Court to thwart Congress's intent based solely on the executive's own admitted decades-long misconduct.

These facts are astounding. And they are undisputed.

5

A.    **For two decades, the United States tested chemical warfare agents on human beings at Edgewood Arsenal.**

Once nicknamed "the place God forgot,"[2] the U.S. Army Laboratories at Edgewood, Maryland, represent an atrocious chapter in American history. Between 1955 and 1975, the Army subjected several thousand people to inhumane and immoral chemical tests at Edgewood. Appx035. Mr. Taylor was one of them. Appx039.

Although we may never know the full extent of what occurred at Edgewood, what we do now know is appalling. The Edgewood Arsenal human testing program marked a resumption during the Cold War of similar testing programs from World War II and even earlier. *See Viet. Veterans of Am. v. Cent. Intel. Agency*, No. C 09-0037 CW, 2013 WL 6092031, at *2 (N.D. Cal. Nov. 19, 2013) (subsequent history omitted). Edgewood involved not just the Department of the Army, but the Central Intelligence Agency and other agencies of the U.S. government, including apparently the VA itself. *See Viet. Veterans of Am. v. Cent. Intel. Agency*, No. C 09-0037 CW, 2013 WL 3855688, at *26 (N.D. Cal. July 24, 2013); *see also Taylor v. Wilkie*, 31 Vet. App. 147, 152 n.2

---

[2] *Secrets of Edgewood*, New Yorker (Dec. 21, 2012), https://www.newyorker.com/news/news-desk/secrets-of-edgewood.

(2019). Sources estimate that the executive exposed some 6,700 service members between 1955 and 1975 to "newer chemical agents that were perceived to pose greater threats than" the agents the executive employed during the previous period. *Viet. Veterans of Am.*, 2013 WL 6092031, at *2 (internal quotation marks and citation omitted); *see* Appx035.

All told, the Department of Defense "administered [between] 250 to 400 chemical and biological agents during the course of its research at Edgewood Arsenal involving human subjects." *Viet. Veterans of Am.*, 2013 WL 6092031, at *2 (citation omitted). These agents ranged in toxicity from "common[ly] approved pharmaceuticals" to sarin gas and narcotics like lysergic acid diethylamide (LSD) and phenylcyclohexyl piperidine (PCP). Appx035. After exposure, the Army made participants like Mr. Taylor complete basic military drills, including rifle range training. *See* Appx040, Appx057.[3] Because exposure often inflicted psychotropic effects, some volunteers mistook these exercises for real-world events—at great psychological cost. *See* Appx040, Appx057.

---

[3] *See also* Mark Brown, *Military Chemical Warfare Agent Human Subjects Testing: Part 1—History of Six-Decades of Military Experiments with Chemical Warfare Agents*, 174 Mil. Med. 1041, 1045 (2009).

Concealing Edgewood for decades from the American public (and other branches of the government), the Army required all Edgewood participants to sign secrecy oaths before entering the program. *See Taylor v. Shinseki*, No. 11-0254, 2013 WL 3283487, at *1 (Vet. App. June 28, 2013); *see also* S. Rep. No. 94-755, at 418 (1976). Each participant agreed to "not divulge or make available any information related to U.S. Army Intelligence Center interest or participation in the . . . Army Medical Research Volunteer Program to any individual, nation, organization, business, association, or other group or entity, not officially authorized to receive such information." S. Rep. No. 94-755, at 418 (1976). The Army threatened the human test subjects with criminal prosecution, dishonorable discharge, and jail time. *See id.*

**B.    At the height of the Vietnam War, Mr. Taylor volunteered to serve his country, including by volunteering for the Edgewood human testing program.**

Mr. Taylor was at his mother's side when, in the summer of 1968, she learned that her older son had been killed in action in Vietnam. *See* Appx039–040, Appx100. His father, who too had served, was also with Mr. Taylor when they received the news. *See* Appx100–101.

Although Mr. Taylor's brother's death exempted Mr. Taylor from service in Vietnam, *see* Appx101, he felt duty bound to enlist, which he did in January of 1969 at the age of 17, Appx028 (DD–214).

With the Vietnam War at its height, Mr. Taylor knew he would serve in combat. *See* Appx040. But while Mr. Taylor was assigned to the 608th Ordnance Company in Fort Benning, Georgia, he learned of an Army program that needed support: the testing program at Edgewood Arsenal. *See* Appx039, Appx046. He volunteered because he thought that was where the Army needed him most. *See Taylor*, 31 Vet. App. at 155 (Greenberg, J., dissenting) ("[Mr. Taylor] was a volunteer, anxious to serve the needs of his Country."). After undergoing a psychological evaluation, he reported to Edgewood on August 30, 1969. Appx039, Appx056–057.

Upon Mr. Taylor's arrival at Edgewood, the Army subjected him to a separate series of psychological tests and required him to sign a secrecy oath. *See* Appx039, Appx077.[4] He was then exposed to some of the deadliest chemicals in the government's stockpile. These compounds included, among others,

---

[4] The Army never provided Edgewood's volunteer soldiers a copy of the secrecy oaths each signed. There is no dispute, however, that Mr. Taylor in fact signed such an oath. *See Taylor*, 31 Vet. App. at 149; *id.* at 156 (Greenberg, J., dissenting).

EA–3580, a nerve agent similar to sarin and VX gas, and EA–3547, a tear gas agent. *Taylor*, 2013 WL 3283487, at *1 & n.2–3; *see Taylor*, 31 Vet. App. at 156 n.6 (Greenberg, J., dissenting). Exposure to the former causes "acute cholinergic toxicity, including dizziness, frontal headache, blurred vision, lethargy, nausea, stomach pain, vomiting, rhinorrhea, chest tightness, wheezing, [fasciculations], sweating on hands and feet, and significantly [decreased] red blood cell cholinesterase levels." *Taylor*, 2013 WL 3283487, at *1 n.2 (citation omitted). Exposure to the latter can cause, respiratory tract irritation, choking, and dyspnea, as well as "stinging and [erythema] at the exposure site." *Id.* at *1 n.3. Mr. Taylor experienced many of these symptoms. *See, e.g.*, Appx056–057.

Beyond their physical toll, Mr. Taylor's experiences left an indelible mark on his mental health. *See* Appx058. Although the exposures themselves clouded Mr. Taylor's memory of his experiences, his memories of Edgewood are abhorrent. *See* Appx057. He recalls, for instance, arriving at a rifle range after exposure and being ordered to shoot at what he believed to be the enemy. Appx040. At other times, he was exposed to agents "in a gas chamber while wearing a mask and having to give only his name, rank and serial number." Appx057. Aside from his own experiences, watching others endure the same

10

type of chemical testing also disturbed Mr. Taylor, then less than a year into his service. *See* Appx057. Three and a half decades after the incident, Mr. Taylor could vividly recall witnessing a "terrified" fellow soldier covered in his own feces and vomit after exposure. Appx057.

Although records of what occurred at Edgewood are scant, Appx035, the records that do exist about Mr. Taylor's experiences indicate he immediately complained after exposure of "hallucinations, nausea, jumpiness, irritability, sleepiness, dizziness, impaired coordination, and difficulty concentrating," *Taylor*, 31 Vet. App. at 155 (Greenberg, J., dissenting). Mr. Taylor's cruel and inhumane exposures required the immediate medical treatment the Army had promised. He sought treatment, but the Army largely ignored his complaints—a trend that would continue for decades. *See* Appx040, Appx067, Appx077.

After just two months at Edgewood, Mr. Taylor returned to his unit at Fort Benning a changed man. *See* Appx046, Appx056. Flashbacks to his time there tormented him, and he suffered "confused thoughts" and insomnia throughout his remaining time in the Army. *See* Appx046; Appx067. These struggles persisted during Mr. Taylor's two combat tours in Vietnam, driving him to become suicidal. Appx042, Appx059.

11

Because of his secrecy oath, Mr. Taylor could not discuss his experiences, even with medical personnel. Appx077. And because Edgewood's records were classified, he could not document his claims. Appx077. Accordingly, medical personnel treated Mr. Taylor—who, again, volunteered to serve despite an exemption—as a liar and a malingerer when he sought help. Appx062; *see* Appx058.

The Army honorably discharged Mr. Taylor in 1971. Appx028. His experiences at Edgewood have plagued him ever since. *See* Appx058. Initially, he "isolated himself from everyone, living in the woods" for a period of time. Appx058. And although he was able to maintain a job for short intervals, a host of physical problems and issues with rage have left his employment history scattered and disjointed. *See* Appx058. His interpersonal relationships have likewise suffered since discharge, and he frequently experiences "violent nightmares and flashbacks." Appx041, Appx058. In short, he endured in silence the classic symptoms of undiagnosed PTSD. *See* Appx062.

**C.     The Army violated its own regulations that, among other things, required it to provide adequate treatment to Edgewood human test subjects.**

Army regulations both before and after Mr. Taylor arrived at Edgewood required the Army to protect and provide care to its soldier volunteers. In

1953, Secretary of Defense Charles Wilson promulgated a set of regulations governing chemical testing on soldier volunteers. *See Viet. Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1072 (9th Cir. 2016). The document imposed commonsense limits: subjects were to give their informed consent before testing and the Army was to "protect the experimental subject against even remote possibilities of injury, disability, or death." *Viet. Veterans of Am.*, 2013 WL 6092031, at *2 (citation omitted). Issued the same year, Army Memorandum CS:385 built on the Wilson Memorandum by expressly dictating that "[m]edical treatment and hospitalization will be provided for all casualties of the experimentation." *Id.* (citation omitted).

Much of the Wilson Memorandum and CS:385 were codified in Army Regulation 70–25, which was operative seven years before Mr. Taylor arrived at Edgewood. *Id.* at *3. In order to "satisfy moral, ethical, and legal concepts," it required that all volunteers "have [the] legal capacity to give consent"; that each be "informed of the effects [of exposure] upon his health or person"; and that "[r]equired medical treatment and hospitalization . . . be provided for all casualties." *Id.* (quoting AR 70–25).

The executive flouted these regulations, for decades. Despite AR 70–25's clear dictates, no executive agency took any steps to treat soldiers like Mr.

Taylor that were injured at Edgewood or to provide them a safe means to seek such treatment, free of the threat of criminal prosecution. *See* Appx062; *see also Viet. Veterans of Am.*, 811 F.3d at 1071. In fact, government medical personnel rebuffed and belittled Mr. Taylor's attempts to seek help. *See, e.g.*, Appx040, Appx062.

Army leaders knew their moral and legal obligations. *See Viet. Veterans of Am.*, 2013 WL 6092031, at *3–6 (describing various Army regulations and memoranda outlining its moral and legal obligations to provide care). The General Counsel for the Army openly acknowledged as early as 1979 "the legal necessity for a notification program" for those participants that were still suffering from their experiences. *Id.* at *3 (citation omitted). Yet, the executive established no adequate forums for those like Mr. Taylor. *See Viet. Veterans of Am.*, 811 F.3d at 1071, 1080. Instead, the secrecy oaths "inhibited" these veterans "from discussing health concerns with their doctors or seeking compensation from the [VA] for potential service-related disabilities." *Viet. Veterans of Am.*, 2013 WL 6092031, at *6 (quoting DOD memorandum dated Jan. 11, 2011).

### D.   The executive branch used its own misconduct to thwart access to Congress's duly appropriated veterans' benefits.

In 2006, the VA finally informed surviving soldier volunteers that it was

partially abating the Army's threat of prosecution. *See* Appx032.[5] Only then could Mr. Taylor and those like him discuss their experiences with their treating physicians. Mr. Taylor immediately applied for service-connected disability benefits effective as of the day following his discharge. Appx038, Appx077. But the executive has steadfastly opposed this commonsense result.

In February of 2007, Mr. Taylor submitted the operative claim to the VA for service-connected benefits. Appx038. A VA examiner agreed with Mr. Taylor's private psychologist that he suffers from both PTSD and major depressive disorder. *See* Appx039–043, Appx055–063. These conditions, the examiner concluded, were "a cumulative response to his participation as a human subject in the Edgewood Arsenal experiments and subsequent re-traumatization in Vietnam." Appx062.

The VA initially granted Mr. Taylor a 70% disability rating and then increased his rating to 100% in October of 2007 based on individual unemployability. *See* Appx064, Appx073–076. The VA concluded that pursuant to 38 U.S.C. § 5110(a)(1), Mr. Taylor was only entitled to benefits effective as of

---

[5] Pertinent guidance allowed Mr. Taylor to "provide details [about his experiences] that affect [his] health to [his] health care provider." Appx032. He could not, however, "discuss anything that relates to operational information that might reveal chemical or biological warfare vulnerabilities or capabilities." Appx032.

February 28, 2007, the date of his initial application. Appx038, Appx068, Appx073. It did so notwithstanding the fact that the executive branch had affirmatively prevented Mr. Taylor from even applying for benefits until 2006. *See* Appx032.

The VA's handling of Mr. Taylor's claim was nearly as tortured as Mr. Taylor's service itself. In 2008, Mr. Taylor appealed the VA's effective-date determination to the Board of Veterans' Appeals (Board), which affirmed the Secretary's decision. Appx078, Appx079–092. The Veterans Court vacated and remanded the Board's decision with instructions to "obtain and account" for the secrecy oath Mr. Taylor signed at Edgewood. *Taylor*, 2013 WL 3283487, at *2.

On remand, the VA did not locate Mr. Taylor's oath. *In re Taylor*, No. 08-13 206, slip op. at 4 (Bd. Vet. App. Apr. 14, 2017). It instead located a sample oath. *See id.* The case—now a decade old—again returned to the Board, which denied Mr. Taylor's request for an earlier effective date. *Id.* at 10.

A divided Veterans Court panel rejected Mr. Taylor's argument for equitable relief. The majority reasoned that it lacked jurisdiction to award the relief Mr. Taylor sought and that equitable relief would encroach on Congress's Appropriations Clause powers. *See Taylor*, 31 Vet. App. at 152–54. It

also dismissed Mr. Taylor's argument that the "VA [had] violated his right to procedural due process by failing to have any process in place by which he could make a claim for benefits . . . prior to the 2006 declassification." *Id.* at 151 (cleaned up).

The dissenting judge would have estopped the government from arguing against Mr. Taylor's claim based on its affirmative misconduct. Characterizing the majority's analysis as "thoughtless" and "heartless," he would have instead used the Veterans Court's equitable powers to ensure that "justice [was] done." *Id.* at 158, 162 (Greenberg, J., dissenting) (citation omitted).

This appeal followed. In a unanimous, published opinion, a panel of this Court reversed. *Taylor v. McDonough*, 3 F.4th 1351, 1374 (Fed. Cir. 2021). The panel held that the executive's affirmative misconduct estopped it from arguing against Mr. Taylor's claim for an earlier effective date. *Id.* at 1374. This Court ordered en banc rehearing on July 22, 2021. *See Taylor v. McDonough*, 4 F.4th 1381, 1381 (Fed. Cir. 2021).

## SUMMARY OF ARGUMENT

I. Having engaged in affirmative misconduct that materially prejudiced Mr. Taylor, the executive should be estopped from arguing that 38 U.S.C. § 5110(a)(1) prevents Mr. Taylor from seeking an earlier effective date.

A.  The executive branch cannot attempt to make the courts an instrument of its affirmative misconduct by asking it to endorse the use of secretive policies to thwart congressional intent.  Here, the executive's threat of criminal prosecution prevented Mr. Taylor from even *seeking* congressionally appropriated benefits.  The law grants courts equitable powers to stop such abuse.  In this case, that means granting Mr. Taylor the earlier effective date to which Congress entitled him.

B.  The arguments against that straight-forward conclusion are meritless.  The Veterans Court, like other similar courts, has inherent equitable authority to grant such relief.  And that relief is entirely consistent with both the Supreme Court's dictates in *Office of Personnel Management v. Richmond* and this Court's precedents.  Court intervention here restores rather than interferes with the Constitution's careful separation of powers.

C.  The judicial branch's intervention is all the more warranted here because Congress intended the courts to have their thumb "on the scale in the veteran's favor" when adjudicating benefits disputes.

II.  The executive's egregious misconduct violated Mr. Taylor's fundamental right of access to courts and the VA processes that are a prerequisite to that right.

A.  The constitutional right of access to courts is well established.  It prohibits the government from taking official action that bars a potential litigant from the forums that could have granted him relief.  The executive's conduct here plainly violated Mr. Taylor's right of access by prohibiting him from filing an application for disability benefits.

B.  Even if this Court were to follow the "active interference" standard articulated in cases like *Silva v. Di Vittorio*, Mr. Taylor is still entitled to relief.  This standard is analogous to the test articulated in other right-of-access cases.  And even assuming some differences, Mr. Taylor's case easily passes muster.

C.  No compelling government interest justifies the executive's actions.  The executive does not have an interest in restricting information regarding the harms it inflicted on Mr. Taylor from being known to the VA, which is part of the executive itself.  Nor were the executive's policies narrowly tailored; any number of less restrictive options were available that could have accommodated both the government's interests and Mr. Taylor's needs.

D.  The only proper remedy in these circumstances is to hold that 38 U.S.C. § 5110(a) is unenforceable to the extent it infringes on Mr. Taylor's constitutional rights.  This remedy mirrors that ordered in other right-of-access

cases and is the only remedy that provides Mr. Taylor what Congress appropriated to him for his injuries.[6]

## ARGUMENT

**I.      The Court should estop the executive from thwarting Congress's intent by depriving Mr. Taylor of the earlier effective date he is due.**

### A.      Courts are empowered to equitably estop the government in cases of affirmative misconduct.

American citizens are guaranteed "some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 61 (1984). Sometimes, as with this case, courts must vindicate that guarantee: Equitable estoppel empowers the Veterans Court and this Court to prevent the executive from using its own affirmative misconduct to thwart congressional intent.[7]

1.      Equitable estoppel is a common-law doctrine "older than the country itself." *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 234 (1959). The

---

[6] Mr. Taylor maintains that 38 U.S.C. § 5110 is also subject to equitable tolling but adheres to this Court's en banc rehearing order, which directed both that the equitable tolling issue was preserved for further review and that the Court did "not wish to secure further briefing on" this issue. *Taylor*, 4 F.4th at 1382.

[7] The availability of equitable relief is a legal determination this court reviews de novo. *See Euzebio v. McDonough*, 989 F.3d 1305, 1318 (Fed. Cir. 2021).

doctrine is rooted in the commonsense maxim that "no man may take advantage of his own wrong." *Id.* at 232. Equitable estoppel is "flexible" in application and courts can invoke it "to avoid injustice in particular cases." *Heckler*, 467 U.S. at 59.

In *Richmond*, the Supreme Court recognized that courts can equitably estop the government. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 423 (1990); *see also id.* at 434 (White, J., concurring). For estoppel to apply against the government, however, a litigant must establish something more than negligence on the part of the government. *Id.* at 421–22; *see also* 33 Fed. Prac. & Proc. Judicial Review § 8354 (2d ed.). Although "the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court has done so, . . . as has every other court of appeals." *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000) (citations omitted); *Tefel v. Reno*, 180 F.3d 1286, 1303 (11th Cir. 1999) (subsequent history omitted) (collecting cases). When coupled with the traditional elements of estoppel—reasonable reliance and material prejudice—affirmative government misconduct merits equitable relief. *See Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011); *Rumsfeld*

*v. United Technologies Corp.*, 315 F.3d 1361, 1377 (Fed. Cir. 2003); *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc).

Consistent with equitable estoppel's flexible nature, no single metric determines whether government action or inaction amounts to affirmative misconduct. *See United States v. Ga.-Pac. Co.*, 421 F.2d 92, 97 (9th Cir. 1970). Federal courts have accordingly held that the government can be estopped in varying circumstances. *See, e.g., Fredericks v. Comm'r of Internal Revenue*, 126 F.3d 433, 451 (3d Cir. 1997) (tax dispute); *Watkins*, 875 F.2d at 708 (discharge dispute); *Fano v. O'Neill,* 806 F.2d 1262, 1265–66 (5th Cir. 1987) (immigration dispute); *USA Petrol. Corp. v. United States*, 821 F.2d 622, 627 (Fed. Cir. 1987) (contract dispute). Although no two estoppel cases are alike, courts have repeatedly applied estoppel when the government's misconduct barred a litigant from vindicating his rights.

*Fano* and *Watkins* present two prototypical examples of affirmative misconduct. In the former, the INS did not process Fano's permanent resident application until after his twenty-first birthday, making him statutorily ineligible for relief. *See Fano*, 806 F.2d at 1263. The INS had allegedly done so "willfully" and in spite of being "urged . . . to expedite" the application. *Id.* at 1263, 1265. Evidence also suggested that the INS had intentionally targeted

22

Fano by failing to follow the expedited-review policy that should have applied to Fano's application. *See id.* at 1266. These allegations, the Fifth Circuit held, "adequately stated" "a cause of action for estoppel against the government." *Id.* at 1265. Because the government offered no evidence to rebut these allegations, the court reversed and remanded the judgment. *Id.* at 1266.

In *Watkins*, the Ninth Circuit estopped the Army from discharging a gay soldier based on then-existing policy that made his sexuality a non-waivable bar to reenlistment. 875 F.2d at 701, 711. The court concluded it was fundamentally unfair to invoke the policy after the Army had regularly found Watkins qualified to serve over his fourteen-year career. Having "acted in violation of its own regulations" for over a decade, the Army could not now invoke the policy to bar reenlistment. *Id.* at 707–08, 711. These circumstances, the court noted, "crie[d] out [for] and demand[ed]" equitable relief. *Id.* at 711.

2.    *Fano* and *Watkins* address prejudice similar to Mr. Taylor's experience. But here, the executive's affirmative misconduct is far worse and far more enduring than in either. Mr. Taylor experienced unspeakable torment at Edgewood. He was exposed to some of the most harmful chemicals in the government's stockpile. *See Taylor*, 2013 WL 3283487, at *1. These exposures

resulted in severe physical and psychological effects, *see* Appx058, and imposed on Mr. Taylor indescribable anguish for thirty-five years, all because the government precluded him from seeking the treatment he needed, Appx062.

The government obtained Mr. Taylor's silence by threatening to exercise its ultimate power: the power to deprive him of his liberty. *See Boumediene v. Bush*, 553 U.S. 723, 739 (2008). It threatened him with criminal prosecution, with dishonorable discharge, and with the loss of the very benefits that he sought if he violated his secrecy oath. *See Taylor*, 3 F.4th at 1371.

The executive made these threats out of its self-interest—continued secrecy and avoidance of providing the care and compensation it promised. The executive made them in spite of the fact that they directly violated the Army's own regulations. *See supra* pp.12–14 (discussing AR 70–25). And the executive made them in spite of the fact that they precluded veterans like Mr. Taylor from receiving the benefits Congress appropriated to them. *See Viet. Veterans of Am.*, 2013 WL 6092031, at *6 (discussing DOD memorandum that acknowledged secrecy oaths "inhibited" veterans from seeking congressionally mandated VA benefits).

In this case, the executive branch, through a concerted effort by various departments, established an actual "legal obstacle" that prevented Mr. Taylor from seeking relief. *Cf. Richmond*, 496 U.S. at 421 (noting that the petitioner in *Montana v. Kennedy*, 366 U.S. 308, 314–15 (1961), had not made out a case of affirmative misconduct because despite bad advice from a consular officer, "no legal obstacle prevented petitioner's mother from returning to the United States"). Just as in *Watkins* and *Fano*, equity here "cries out and demands" relief. *Watkins*, 875 F.2d at 711.

## B.     Arguments against estoppel are meritless.

In refusing to estop the executive's misconduct, the Veterans Court reasoned both that it lacked the power to invoke estoppel in the absence of an explicit statutory grant of such privilege and that the Supreme Court's opinion in *Richmond* precluded relief. It was mistaken.

### 1.     The Veterans Court has inherent authority to apply equitable estoppel.

The Veterans Court was created by the Veterans' Judicial Review Act (VJRA) of 1988. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 432 (2011). Congress sought "to ensure that all veterans are served with compassion, fairness, and efficiency, and that each individual veteran receives from the VA every benefit and service to which he or she is entitled under law."

S. Rep. No. 100-418, at 31 (1988); *accord id.* at 29.  It also sought to eliminate the perception among veterans that they had been "denied their 'day in court.'"  *Id.* at 30–31.

Congress therefore broadly empowered the Veterans Court "to review Board decisions adverse to veterans," *Henderson*, 562 U.S. at 432, and to "affirm, modify, or reverse a decision of the Board or . . . remand the matter, as appropriate," 38 U.S.C. § 7252(a).  Congress modeled the scope of that review after the same powers it granted Article III courts long ago in Section 706 of the Administrative Procedure Act.  *Compare* 5 U.S.C. § 706, *with* 38 U.S.C. § 7261.  Specifically, Congress empowered both to, among other things, "compel agency action unlawfully withheld or unreasonably delayed," and to "hold unlawful and set aside agency action, findings, and conclusions."  5 U.S.C. § 706(1)–(2); *see* 38 U.S.C. § 7261(a)(2)–(3).  No one disputes Article III courts can exercise their equitable powers within the scope of that review.  *See, e.g.*, *Schwebel v. Crandall*, 967 F.3d 96, 99 (2d Cir. 2020).  There should be no dispute that Congress has bestowed those powers on the Veterans Court, as well.

1.    Congress's grant of power to the Veterans Court in statutes like §§ 7252(a) and 7261 illustrates that it intends the Veterans Court—like other courts of law—to be able to equitably estop a litigant.  Any demand for a more

"explicit statutory grant" of authority to estop litigants is misplaced and contrary to law. *Taylor*, 31 Vet. App. at 154 n.4 (cleaned up).

"Congress legislates against a background of common-law adjudicatory principles and it expects those principles to apply except when a statutory purpose to the contrary is evident." *Minerva Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298, 2307 (2021) (cleaned up). Veterans benefits statutes are no exception. *See Lofton v. West*, 198 F.3d 846, 850 (Fed. Cir. 1999) ("Congress legislates against a common law background."). Nowhere did Congress withhold from the Veterans Court the power to equitably estop litigants. It thus necessarily intended that court to exercise its inherent equitable powers when appropriate. *See In re Bailey*, 182 F.3d 860, 865 (Fed. Cir. 1999).

As this Court has recognized previously, such things as § 7252(a)'s broad grant of jurisdiction and other standard powers Congress bestowed on the Veterans Court through laws like the All Writs Act grant the Veterans Court the power to, among other things, sanction attorneys, *see id.*; certify a class, *see Monk v. Shulkin*, 855 F.3d 1312, 1319 (Fed. Cir. 2017); enter judgment *nunc pro tunc*, *see Padgett v. Nicholson*, 473 F.3d 1364, 1368 (Fed. Cir. 2007); equitably toll a filing deadline, *see James v. Wilkie*, 917 F.3d 1368, 1370 (Fed. Cir. 2019); and issue writs of mandamus, *see Martin v. O'Rourke*, 891 F.3d

27

1338, 1343 (Fed. Cir. 2018).  The power to equitably estop a litigant fits comfortably within the same inherent common law authority.  *See Cann v. Carpenters Pension Tr. for S. Cal.*, 662 F. Supp. 501, 505 (C.D. Cal. 1987) ("[E]quitable estoppel is a weapon in this court's arsenal of inherent equitable powers.").  Indeed, other Article I Courts routinely invoke the doctrine as part of their inherent powers to see that justice be done.  *See, e.g.*, *In re Kip & Andrea Richards Family Farm & Ranch, LLC*, 613 B.R. 699, 706 (B.A.P. 8th Cir. 2020); *Buesing v. United States*, 42 Fed. Cl. 679, 698 (1999).  The Veterans Court can do so, too.  *See Bokum v. Comm'r of Internal Revenue*, 992 F.2d 1136, 1140 (11th Cir. 1993) ("Although of limited jurisdiction, the Tax Court must have the power to consider an equitable estoppel claim, if considering the claim is necessary to the appropriate disposition of the case before it.").

2.     Of course, this Court has set limits on the Veterans Court's equitable powers.  *See, e.g.*, *Burris v. Wilkie*, 888 F.3d 1352, 1356–62 (Fed. Cir. 2018).  But such routine appellate limit-setting does not equate to robbing that court of those powers entirely.

For example, *Burris* addressed educational benefits to which the claimants were not entitled but which the VA Secretary was permitted to provide if the claimants were deemed "equitably entitled to such moneys."  *Id.* at 1358

(citation omitted). Section 503, which granted the Secretary this power, permitted the Secretary to correct "administrative error" by his Department. 38 U.S.C. § 503(a). Burris asked the Secretary to correct such administrative error and also argued "that the *Veterans Court* itself [had] jurisdiction to grant the equitable relief that he [sought]." *Burris*, 888 F.3d at 1356. This Court rejected Burris's argument, holding that any contrary conclusion would have impermissibly "expand[ed] the scope of [the Veterans Court's] statutory jurisdiction." *Id.* at 1361 (emphasis omitted).

But *Burris* does not deprive the Veterans Court of equitable estoppel power. In fact, the Court acknowledged the Veterans Court's "equitable powers" and held only that the court could not exercise such power where Congress had reserved it to the Secretary. *Id.* at 1360–61. It likewise cited with approval *Servello v. Derwinski*, a case where the Veterans Court precluded the VA "from asserting on remand that a claimant's informal claim was not a cognizable claim for effective-date purposes." *Id.* (cleaned up); *see Servello v. Derwinski*, 3 Vet. App. 196, 200 (1992); *see also Rosenberg v. Mansfield*, 22 Vet. App. 1, 6 (2007) (Kasold, J., concurring) (describing *Servello* as an equitable estoppel case). As in *Servello*, the relief Mr. Taylor seeks fits comfortably within the Veterans Court's jurisdiction.

29

In any event, Mr. Taylor's case is unlike *Burris*. No "administrative error" led to the wrongs inflicted on Mr. Taylor. Instead, the executive's sweeping misconduct led to this injustice. Using equitable powers to correct such an injustice is a core function of the courts. This does not expand the scope of the Veterans Court's jurisdiction: It vindicates the power of the courts to prevent the executive from thwarting Congress's intent.

### 2.    The Appropriations Clause does not bar equitable estoppel in this case.

The relief Mr. Taylor seeks is entirely consistent with the Appropriations Clause's dictates that "[n]o [m]oney . . . be drawn from the Treasury, but in [c]onsequence of [a]ppropriations made by [l]aw." U.S. Const. art. I, § 9, cl. 7. Under *Richmond*, the Clause is only implicated if relief would be "in direct contravention of [a] federal statute." *Richmond*, 496 U.S. at 424. Mr. Taylor's request for relief is consistent with, not contrary to, the veterans' benefits scheme. And it is consistent, as well, with this Court's decision in *McCay v. Brown*, which merely applied *Richmond*'s "direct contravention" standard to facts materially different than here.

### a.   *Richmond* does not support the government's position.

1.   *Richmond* allows equitable estoppel here, first, because the Supreme Court did not consider a claim for estoppel based on a decades-long course of affirmative misconduct by multiple departments within the executive branch.  The plaintiff in *Richmond* was instead the victim of simple government negligence.  Because of negligent advice by well-meaning government personnel, Richmond became ineligible for benefits for a short period of time.  The mistake cost him six-months'-worth of annuity benefits, or $3,993.  *Id.* at 417–18.  Richmond filed suit, arguing "that the erroneous advice [he received] should estop [the executive] and bar its finding him ineligible for benefits under the statute." *Id.* at 418.

The Supreme Court disagreed, holding that the Appropriations Clause prevents the judiciary from estopping the executive based on negligent misrepresentations by individual, and often well-meaning, government employees.  *See id.* at 424.  The Court warned that "[i]f agents of the [e]xecutive were able, by their unauthorized oral or written statements to citizens, to obligate the . . . payment of funds, the control over public funds [would] in effect . . . be transferred to the [e]xecutive." *Id.* at 428.  That result would present serious separation-of-powers concerns because the executive cannot "secure perfect

31

performance from its hundreds of thousands of employees scattered through-out the continent." *Id.* at 433 (citation omitted).

*Richmond* repeatedly returns to this focus on misrepresentations by individual officials as the animating concern for its holding. *See, e.g.*, *id.* at 417 (Richmond received "incorrect advice"); *id.* at 416 (Richmond received "erroneous information"); *id.* at 428 (referring to "unauthorized oral or written statements to citizens" by "agents of the [e]xecutive"). Mr. Taylor's claim, by contrast, presents none of these concerns. Mr. Taylor did not rely on the mistaken advice of just one or a handful of executive branch employees. Rather, the executive branch as a whole muzzled Mr. Taylor by threatening his very liberty. As a result, for decades, he was unable to apply for the benefits that Congress appropriated for him and those like him. The executive's coordinated, decades-long misconduct—not mere individualized inadvertence—thwarted Mr. Taylor. Thus, *Richmond*'s limitation on equitable estoppel does not apply.

2.    The Veterans Court went even further, reading *Richmond* to "shut the door on all estoppel claims against the government . . . when the claimant seeks monetary relief." Appx008. That was error under this Court's precedents.

As this Court has explained, "*Richmond* [does not stand] for the proposition that equitable estoppel will not lie against the government for any monetary claim." *Burnside-Ott Aviation Training Ctr., Inc. v. United States*, 985 F.2d 1574, 1581 (Fed. Cir. 1993). The Supreme Court held only that the Appropriations Clause would be violated if the ultimate relief sought "would be in direct contravention of [a] federal statute." *Richmond*, 496 U.S. at 424.

*Richmond* thus did not enshrine a blanket prohibition on estoppel in cases involving claims for money. Rather, this Court held, "*Richmond* is limited to 'claim[s] for the payment of money from the Public Treasury *contrary to a statutory appropriation*.'" *Burnside-Ott*, 985 F.2d at 1581 (emphasis in original) (quoting *Richmond*, 496 U.S. at 424); *see also United States v. Cox*, 964 F.2d 1431, 1435 (4th Cir. 1992) (*Richmond* applies where estoppel would "cause funds to be appropriated in contravention of [c]ongressional authority"); *Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, 469 F. Supp. 3d 459, 479 (D. Md. 2020) (similar); *Fitzgerald Truck Parts & Sales, LLC v. United States*, 391 F. Supp. 3d 794, 798 (M.D. Tenn. 2019) (similar).

The relief Mr. Taylor seeks vindicates congressional intent rather than contravenes it. In considering whether a claimant's request directly conflicts

with a statutory appropriation, this Court "look[s] to the purpose" that animated the statute as a whole. *Brush v. Off. of Pers. Mgmt.*, 982 F.2d 1554, 1562 (Fed. Cir. 1992); *cf. FDIC v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994) (estoppel permissible when application "does not frustrate the purpose of the statutes expressing the will of Congress or unduly undermine the enforcement of the public laws").

The statutory framework in *Richmond*, for instance, followed a simple design: Congress would provide "one economic benefit (disability annuity) as a substitute for another economic benefit (income) that the annuitant could have earned were there no disability." *Brush*, 982 F.2d at 1562. Once the annuitant's income was restored, his or her right to the annuity would be extinguished. Because Richmond's claim for relief would have resulted in him getting his annuity *and* an income that was comparable to the wages he earned pre-injury, his claim for relief directly conflicted with Congress's statutory framework.

Mr. Taylor's case creates no such conflict. VA benefits "are nondiscretionary, statutorily mandated benefits." *Martin*, 891 F.3d at 1341 (citation omitted). Congress's authorization and appropriation is clear: The United States "*will pay* to any veteran" compensation for "disability resulting from

personal injury suffered . . . in [the] line of duty" if the veteran is "discharged or released under conditions other than dishonorable." 38 U.S.C. § 1110 (emphasis added). Congress designed these benefits to compensate veterans who sacrificed their minds and their bodies for their country.

Mr. Taylor is one of those veterans. There is no meaningful dispute that but for the executive's misconduct, Congress entitled Mr. Taylor to receive benefits as of 1971: He was injured as of his date of discharge as "a cumulative response to his participation as a human subject in the Edgewood Arsenal experiments and subsequent re-traumatization in Vietnam," Appx062, and would have received benefits as of that date but for the government's misconduct.

The relief Mr. Taylor seeks therefore perfectly aligns with the federal scheme in question because Mr. Taylor "ha[s] not asked for anything that Congress did not intend for the statute to provide" and "all of the substantive qualifying requirements were met." *Brush*, 982 F.2d at 1562–63. "[T]he Appropriations Clause is no bar to recovery in a case like this one, in which 'the express terms of a specific statute' establish 'a substantive right to compensation[.]'" *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 198 n.9 (2012) (quoting *Richmond*, 496 U.S. at 432).

*Richmond* considered whether the courts could grant monetary benefits

when a litigant relies on an executive agent's isolated, innocent misrepresentations about statutory benefits. The Court said "no": It was unwilling to give innocent misrepresentations the "practical force of law" when that advice was contrary to "the letter of the difficult judgments reached by Congress." *Richmond*, 496 U.S. at 428. Given the size of the executive's footprint, doing the opposite would have rendered the Appropriations Clause a "nullity." *Id.*

In fact, not only is Mr. Taylor's requested relief consonant with *Richmond*, but it actually vindicates and upholds the Constitution's separation of powers. By prohibiting courts from equitably estopping the government even in cases where the executive's immoral policies thwart Congress's appropriation of funds, the Veterans Court's holding raises serious separation-of-powers concerns. That is, the Veterans Court has effectively held that the executive can trample on Congress's Appropriations power. Preventing that is one of the very reasons courts exist.

That being the case, the separation-of-powers concerns in this case cut in the *opposite* direction from *Richmond*. When the executive misuses its powers to thwart Congress's clear dictates, the injury to separation of powers is different not only in degree, but in kind to that which occurred in *Richmond*.

36

*See Fitzgerald*, 391 F. Supp. 3d at 798 ("Mistaken advice on one or two occasions by someone arguably not in the know is one thing, but mistakes made on four separate examinations in three different decades may be quite another . . . ."). Negligent misrepresentations no doubt could undermine Congress's *intent*, but they do not challenge Congress's *power* in the same way as affirmative misconduct can. In the latter, the President undermines the will of the people's branch. He is acting not merely at the "lowest ebb" of his power, but in direct violation of his obligation to faithfully execute the laws. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . faithfully executes them." (cleaned up)). In those instances, courts must "scrutinize[] with caution" the President's actions and then correct them immediately, as no less than "the equilibrium established by our constitutional system" is at stake. *Youngstown Sheet*, 343 U.S. at 638 (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197 (2012) (judicial review appropriate when the executive allegedly "aggrandiz[ed] its power at the expense of another branch").

In fact, courts routinely check the executive when it invades the province of the people's branch. *NLRB v. Noel Canning* is an example. 573 U.S. 513 (2014). That case concerned another of the legislature's exclusive powers, the power to confirm "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States." *Id.* at 523. In *Noel Canning*, the President had encroached on that power by nominating an officer of the United States via a Recess Appointment when the Senate had been in recess for just three days. *See id.* at 519. The Supreme Court intervened, holding the appointment unconstitutional because it invaded the province of the legislature. *Id.* at 557.

It is as appropriate for the Court to intervene here as it was in *Noel Canning*. Here, through "adverse-possession," the executive has thwarted Congress's express will to provide veterans like Mr. Taylor with the benefits they need and deserve, for as long as they need and deserve them. *Cf. id.* at 570 (Scalia, J., concurring in the judgment) (analogizing the President's historical use of his recess appointment powers to an encroachment on the power of the legislature through "adverse possession"). It has done so with full awareness that Congress intended a different result. *See Viet. Veterans of*

*Am.*, 2013 WL 6092031, at *6 (discussing DOD memorandum that acknowledged secrecy oaths had "inhibited" veterans from seeking congressionally mandated VA benefits (citation omitted)).  The courts must step in and correct this constitutional imbalance.

3.     Section 5110 does not create a conflict under *Richmond*, either.  That provision authorizes an "effective date" as early as "the day following the date of the veteran's discharge or release if application therefor is received within one year from such date of discharge or release," but otherwise no earlier than "the date of receipt of [the] application" for benefits. 38 U.S.C. § 5110.

Congress's intent in § 5110 is apparent:  It encouraged veterans to file for benefits as soon as their claim ripened or else lose benefits they might have otherwise received.  *See id.*  That design makes sense, because it encourages diligence on the part of veterans and eases the administrative process for the VA.

The general limit on the temporal scope of disability benefits created by § 5110 does not, however, preclude equitable exceptions in appropriate cases.  *Cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) (stating that "estoppel does not undermine Congress' prescription [for a statute of limitations], for it rests on misleading, whether engaged in early on, or later in

time"). And if any case is appropriate for an equitable exception, it is Mr. Taylor's. Mr. Taylor's request for relief is not in "direct contravention" of § 5110 because, unlike most veterans, he was *not* free to file for benefits as soon as his claim ripened. *Richmond*, 496 U.S. at 424. He was affirmatively prevented from doing so—by the executive itself.

It is not as though Mr. Taylor thought filing would have been futile. *Cf. McCay v. Brown*, 106 F.3d 1577, 1581 (Fed. Cir. 1997) (*Richmond* implicated when claim could have been but was not filed earlier because claimant believed it was "futile" to do so). Nor does Mr. Taylor assert that he was "actively misled into not filing his claim." *AF v. Nicholson*, 168 F. App'x 406, 408 (Fed. Cir. 2006). Instead, the executive's unequivocal threat of criminal prosecution and deprivation of liberty foreclosed him from filing for benefits.

These circumstances simply do not undermine § 5110's purpose. To suppose that they do, one must assume that Congress intended the executive to be able to establish immoral policies that contravene the executive's own regulations and thereby prevent veterans from applying for benefits within one year of discharge. No reasonable person could conclude that that comports with congressional intent. Instead, one must suppose that Congress intended Mr. Taylor to receive the same effective date as someone who sprained his

ankle in service and applied for benefits—unfettered by threats to his lib-
erty—the day after the military discharged him.  When considered in this
light, *Richmond* does not bar equitable relief.  It demands it.

### b.    *McCay* does not support the government's posi-
### tion.

The Veterans Court further erred in concluding that *McCay v. Brown*
and similar precedents of this Court were inconsistent with the equitable re-
sult in this case.  Those precedents, which merely follow from the Supreme
Court's directives in *Richmond*, do not bar relief any more than *Richmond*
itself does.

1.    In *McCay*, this Court considered whether a Vietnam veteran who
had developed soft tissue sarcoma—a type of cancer—as a result of his expo-
sure to Agent Orange was entitled to an earlier effective date.  106 F.3d at
1578–79.  McCay did not apply for benefits at the time he fell ill.  He believed
it "futile" to do so because VA policy at the time did not recognize a connection
between soft tissue sarcoma and exposure to Agent Orange.  *Id.* at 1581.  Once
the VA recognized such a connection, McCay sought benefits reaching back
several years before the date of his application.  *Id.* at 1579.

This Court concluded that equitable estoppel did not entitle McCay to
his requested relief.  *See id.* at 1581–82.  It based that result on 38 U.S.C.

41

§ 5110(g), which addressed this exact scenario by permitting retroactive benefits of up to a "year from the date of application therefor or the date of administrative determination of entitlement, whichever is earlier."

Section 5110(g) operates under the assumption that a veteran is free to file a benefits claim either before or after a liberalizing law is passed—an assumption that is true in nearly every case. If a veteran files a claim before Congress passes such a law and the VA denies it, that veteran may nonetheless be entitled to an effective date based on the date of his initial application once Congress does pass the liberalizing law. *See McCay*, 106 F.3d at 1581. In contrast, if a veteran first files a claim after the liberalizing law is passed and the VA grants the claim in light of the new law, the claimant may only be able to collect retroactive benefits of up to a year before the date of this initial, post-liberalization application. *See id.* at 1580–81. In that situation, the statute provides claimants time to learn of the change in the law without losing out on benefits, *see id.*, but it does not give the veteran the benefit of some notional earlier application he never made.

McCay did not file for benefits when he first fell ill despite the fact that he was free to do so. *See id.* at 1581. He nonetheless argued he was entitled to benefits as of that date because of the government's misstatements about

42

the connections between Agent Orange and cancer. *See McCay v. Brown*, 9
Vet. App. 183, 189 (1996). He thus sought to "use the theory of equitable es-
toppel to recover money the VA [was] not authorized to pay, namely benefits
retroactive to a date more than one year before the date of his application."
*McCay*, 106 F.3d at 1581. In line with *Richmond* and because Congress had
"expressly foreclosed such payments," this Court declined to estop the execu-
tive from arguing against an earlier effective date. *Id.*

2. *McCay* does not bar Mr. Taylor's claim for three reasons. *First*,
McCay sought relief that directly contravened Congress's statutory appropri-
ation. That is, he asked this Court to *override* Congress's express dictates as
to the precise situation McCay faced. Unlike Mr. Taylor, McCay was always
free to file for benefits. Had he done so at the time he fell ill, § 5110(g) would
have entitled him to benefits based on that earlier date. *See McCay*, 106 F.3d
at 1581. There was no "legal obstacle" to him doing so. *Cf. Richmond*, 496
U.S. at 421 (discussing *Montana*, 366 U.S. at 314–15). Instead, he declined to
apply for benefits earlier because he thought it was "futile" to do so. *McCay*,
106 F.3d at 1581.

Congress presumes that veterans are free to file for benefits at any time.
If that presumption is true—as it generally is—Congress's statutory dictates

in § 5110 control.  Because McCay was free to file for benefits as soon as his claim ripened, granting him relief would have provided him a second bite at an apple he never bit in the first place—a result directly contrary to Congress's dictates in § 5110(g).  He accordingly was not entitled to relief.

The same cannot be said of Mr. Taylor.  The executive used its coercive powers to prevent him from applying for benefits before 2006.  Had the executive not engaged in such misconduct, there is no dispute that Mr. Taylor could have applied within a year of his discharge and thereby received benefits dating to the day after his discharge.  This case is therefore the converse of *McCay*.  There, the Court was asked to do the opposite of what Congress had expressly ordered.  Here, the Court is being asked to *vindicate* Congress's intent.

*Second*, *McCay*—like *Richmond*—did not concern the type of systemic misconduct at issue here.  McCay argued he was entitled to equitable relief "because he relied on information provided to Congress and the public by [the] VA that no causal link existed between [Agent Orange] and cancer." *McCay*, 9 Vet. App. at 189 (cleaned up).  There was no evidence that the government did not believe those statements at the time they were made, or that the statements were made with a specific intent to deprive veterans of benefits.  In

44

other words, although the context was different than in *Richmond*, McCay sought relief because of a mistaken representation by a government official—just like in *Richmond*.

*Finally*, this case does not implicate *Richmond*'s concern that estoppel could open a litigation floodgate. *See Richmond*, 496 U.S. at 433. Similar concerns no doubt animated *McCay*, which at its core was about whether certain injuries were service connected. Such a contention is routinely litigated through to this Court and indeed is often how injuries *become* service connected. In other words, estoppel in such situations would create a seismic threat to veterans' benefits adjudication.

But thankfully, affirmative misconduct like that which occurred here is rare, eliminating concerns about a flood of litigation or judicial overreach. By exercising such power only when both the executive has seriously overstepped and when doing so would further Congress's intent, the judiciary *maintains* the founders' careful checks and balances, rather than undermining them.

### c.    In the alternative, the Court should clarify *McCay*.

For the reasons articulated, *McCay* and this Court's other precedents are entirely consistent with granting Mr. Taylor relief. But if the Court is inclined to do so, this case also allows the Court to clarify *McCay*'s reasoning

to the extent that it extends beyond *Richmond* and is in tension with this Court's other precedents.

*First*, to the extent *McCay* can be read to suggest that equitable estoppel can *never* lie against the government even in cases of affirmative misconduct, it overreads *Richmond*. As this Court has recognized in other cases since *McCay*, *Richmond* does not extend that far. *See, e.g.*, *Zacharin*, 213 F.3d at 1371.

This makes sense, because the Supreme Court expressly left "for another day whether an estoppel claim could ever succeed against the Government." *Richmond*, 496 U.S. at 423. It did not have the opportunity to meaningfully consider the question here—whether systemic and affirmative executive misconduct allows estoppel—because Richmond was the victim of simple negligence by isolated government officials. *See id.* at 418; *see also Hulsey*, 22 F.3d at 1490 (a case involving "affirmative misconduct on the part of the government . . . has yet to be presented to the [Supreme] Court"). Thus, to the extent *McCay* may suggest that courts can never estop the executive's affirmative misconduct, the Court should use Mr. Taylor's case to dispel that mistaken notion.

*Second*, aspects of *McCay* conflict with other precedents of this Court.

46

As this Court stressed in *Brush*, the Court "look[s] to the purpose of the statute" when deciding whether the requested relief is directly contrary to a statutory appropriation. *Brush*, 982 F.2d at 1562; *see also Burnside-Ott*, 985 F.2d at 1581 ("*Richmond* is limited to claims for the payment of money from the Public Treasury *contrary to a statutory appropriation*." (cleaned up)). That follows from the rule that a court may estop the executive if doing so "does not frustrate *the purpose of the statutes expressing the will of Congress* or unduly undermine the enforcement of the public laws." *Hulsey*, 22 F.3d at 1489 (emphasis added).

*McCay*, although arriving at the correct result, *see supra* Part I.B.2.b, did so without fully grappling with the purpose behind Congress's statutory framework. Lower courts thus could rely on it to deny equitable relief that is warranted, consistent with Congress's intent, and permissible under Supreme Court precedent. To the extent that is the case, Mr. Taylor's appeal allows this Court to align *McCay* with this Court's other precedents.

### C.    The executive's position violates the Veterans' Canon.

Equitable estoppel on these facts lies comfortably within governing precedent, and the Court never needs to get to a "tie break." But if any doubt remained that the courts may equitably estop the executive from denying Mr.

Taylor an earlier effective date, it is removed by the "canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." *Henderson*, 562 U.S. at 441 (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220 n.9 (1991)). This long-established canon requires that "interpretive doubt is to be resolved in the veteran's favor." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see also Shinseki v. Sanders*, 556 U.S. 396, 412 (2009) ("[W]e recognize that Congress has expressed special solicitude for the veterans' cause."); *id.* at 416 (Souter, J., dissenting) (noting "Congress's understandable decision to place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions").

As discussed, the VJRA grants the Veterans Court (and this Court) the power to use equitable estoppel in the circumstances of Mr. Taylor's case. In fact, it is consistent with the whole of American jurisprudence to assume Congress meant the VJRA's broadly worded provisions to grant the Veterans Court (and this Court) the same equitable powers it grants other courts.

Yet, the executive asks this Court to do the opposite—to read language in the VJRA that is identical to language in the APA as affirmatively *depriving* the Veterans Court (and this Court) of such equitable powers. This argument

turns the pro-veteran canon on its head, by reading into a broad grant of jurisdiction a sharp limit on the Court's ability to prevent the executive from thwarting congressional intent.

Indeed, it is difficult to imagine a rule that is more *anti*-veteran than the one adopted by the government and the Veterans Court. The anti-estoppel position creates a Kafkaesque system in which veterans—who are among those most harmed by their service to their country—are most likely to be denied disability benefits when the executive wrongfully prevents them from even applying in the first place. That dire result cannot be what Congress intended, and it cannot be the law.

## II.  The executive's conduct violates Mr. Taylor's constitutional right of access to the courts and administrative processes.

Even if the Court declines to estop the government, it still should grant Mr. Taylor the relief he seeks. The executive denied Mr. Taylor any meaningful right of access to the courts or to VA processes for at least 35 years—from his discharge from active duty military service in September 1971 to 2006.[8] Under any conceivable test for deprivation of the right of access, the executive

---

[8] This Court reviews constitutional challenges de novo. *See Cushman v. Shinseki*, 576 F.3d 1290, 1296 (Fed. Cir. 2009).

has denied Mr. Taylor a fair opportunity to present his claim for disability benefits.  No government interest could justify this total deprivation of his constitutional right—certainly not any compelling interest—and the executive's failure to provide any alternative means of access during this time is not tailored at all, let alone narrowly tailored.

The Court should remedy the violation of Mr. Taylor's constitutional right of access by holding that the government may not bar access to VA and court processes for veterans subject to secrecy oaths absent narrowly tailored equivalent procedures that provide such access.  Because it did not provide such procedures here, the executive may not lawfully enforce the effective-date provision of § 5110(a) against Mr. Taylor.

### A.    The executive branch violated Mr. Taylor's right of access to VA processes and the courts by precluding him from filing for benefits.

1.    "It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution."  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261–62 (6th Cir. 1997) (citation omitted); *see Lewis v. Casey*, 518 U.S. 343, 350 (1996) (right of access to courts is "well-established"); *accord Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir. 1998); *Nordgren v. Milliken*, 762 F.2d 851, 853 (10th Cir. 1985).  The Bill of Rights confers the inalienable

rights "to petition the Government for a redress of grievances" and not to be deprived of "life, liberty, or property, without due process of law."  U.S. Const. amends. I, V.  From this derives the constitutional right of access to the courts. *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) (due process); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) (First Amendment); *see also Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (equal protection); *Chambers v. Balt. & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907) (article IV privileges and immunities clause).

"The right of access to the courts is . . . one aspect of the right [to] petition" the government for a redress of grievances and is not limited solely to process before a judicial body.  *Cal. Motor Transp.*, 404 U.S. at 510, 513.  Rather, "the right to petition extends to all departments of the Government," because "[t]he same philosophy governs the approach of citizens . . . to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts."  *Id.* at 510.  Under the Due Process Clause, the right of access protects, at minimum, one's ability "to prepare a petition or complaint," *Wolff*, 418 U.S. at 576, and file it before an adjudicative body, *see Casey*, 518 U.S. at 350 (listing cases); *see also Ex parte Hull*, 312 U.S. 546, 549 (1941).

2.    For example, in *Bill Johnson's Restaurants, Inc. v. NLRB*, the Supreme Court held unconstitutional a National Labor Relations Board cease-and-desist order enjoining an allegedly retaliatory lawsuit an employer brought against former employees for engaging in protected activities under the National Labor Relations Act. 461 U.S. 731, 733, 742–43 (1983). The Court acknowledged the strong policy basis for the Board's actions: "Where, as here, such a suit is filed against hourly-wage waitresses or other individuals who lack the backing of a union, the need to allow the Board to intervene and provide a remedy is at its greatest." *Id.* at 741. But even under these circumstances, the "weighty countervailing considerations" implicated by the necessity of safeguarding the right of access supersedes this need. *Id.* That is, "[t]he right of access to a court is too important" to be impeded by even the well-intentioned enforcement of a federal statute, so long as the underlying suit is not a "mere sham." *Id.* at 741, 744 (citations omitted).

Similarly, the constitutional right of access gives rise to *Noerr-Pennington* immunity in antitrust cases, which shields litigants from any liability under the Sherman Act for petitioning activity, even if this petitioning activity directly undermines the purpose of the statute. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965); *E. R.R. Presidents Conf. v. Noerr*

*Motor Freight, Inc.*, 365 U.S. 127, 136 (1961).  In other words, when enforcing the Sherman Act collides with the constitutional right of access, the Act must yield.

3.    The core constitutional violation is Mr. Taylor's inability to petition for an effective date of September 7, 1971.  This is so because (1) the executive branch prevented him from seeking health care or filing an application for benefits for 35 years under penalty of court martial or criminal prosecution; (2) the VA's and courts' interpretation of 38 U.S.C. § 5110(a) now operates to bar his claim, notwithstanding the fact that he was precluded by the executive from making an earlier filing; and (3) over all this time, the U.S. government has failed to provide any meaningful alternative process that honors Mr. Taylor's rights.

There is no dispute that the executive subjected Mr. Taylor to "systemic official action" that prevented him from seeking benefits related to injuries he incurred in the Edgewood program before the mid-2000s.  It is also undisputed that there was no alternative, equivalent procedure in place to safeguard Mr. Taylor's constitutional right of access.  *See* Appx062 (Initial Evaluation for PTSD) ("He experienced unusual physical and psychological problems but there was no help available to him due to the secret status of the research.");

*Viet. Veterans of Am. v. Cent. Intel. Agency*, 288 F.R.D. 192, 199 (N.D. Cal. 2012) ("Such oaths or other non-disclosure requirements have reportedly inhibited veterans from discussing health concerns with their doctors or seeking compensation from the Department of Veterans Affairs for potential service-related disabilities." (quoting DOD memorandum, Jan. 11, 2011)).  And the "option" of filing a claim for benefits under the threat of court martial or prosecution for violating a secrecy oath is no option at all.  Accordingly, the executive has barred him from access to any administrative or judicial proceeding to seek relief, thereby violating his constitutional rights.

Title 38 of the U.S. Code serves an important role in facilitating the orderly administration of veterans' benefits.  But as with the Sherman Act and the National Labor Relations Act, its provisions must yield when they deny Mr. Taylor his fundamental right of access to VA processes and the courts. *See Bill Johnson's Rests.*, 461 U.S. at 744; *Pennington*, 381 U.S. at 670; *Noerr*, 365 U.S. at 136.  As applied in these circumstances, the effective-date provisions of 38 U.S.C. § 5110(a) reward the executive's wrongful denial of Mr. Taylor's access, and the executive cannot, therefore, enforce them against him.

**B.    The executive also violated Mr. Taylor's right of access under the standards articulated in incarcerated persons cases.**

In its Order setting the case for en banc review, the Court directed the parties to address whether the test for violation of the right of access is "whether the government has engaged in 'active interference' that is 'undue,' as suggested by *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011), and related cases." *Taylor*, 4 F.4th at 1382.  It is not clear that this test is, in application, meaningfully different from the right of access test applied in nonprisoner cases like those outlined above.  Even if it were, because Mr. Taylor has been a free person for the duration of the 35 years that the executive denied his right of access, the consequences of conviction (including any higher bar those impose on the right) do not impair his right of access.  *See Casey*, 518 U.S. at 355 (holding that "[t]he tools [the Constitution] requires to be provided [to inmates] are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement").  But even supposing that the test requiring "active interference" that is "undue" differs from other contexts and applies to this case, Mr. Taylor's case easily passes this bar.

1.    In cases involving incarcerated persons, many courts distinguish between two types of right-of-access claims: those involving the right to affirmative legal assistance to prepare initial pleadings and those involving the right to litigate without "active interference" that is "undue." *Silva*, 658 F.3d at 1103; *see Snyder v. Nolen*, 380 F.3d 279, 290 (7th Cir. 2004); *John L. v. Adams*, 969 F.2d 228, 235 (6th Cir. 1992). To establish a violation under the latter standard, the plaintiff must show that official government action prevented him from "pursu[ing] legal redress for claims that have a reasonable basis in law or fact." *Snyder*, 380 F.3d at 291.

Courts have routinely held that when the government prohibits or prevents prisoners from seeking relief within prescribed time limits, that constitutes undue, active interference and, therefore, violates their rights of access. For example, in *Jackson v. Procunier*, the court reversed the district court's dismissal of a pro se prisoner petition, holding that the prisoner had stated a claim for deprivation of his constitutional right of access by alleging the prison's consistent and deliberate practice of delaying mailing of prisoner court filings, in his case by five days. 789 F.2d 307, 308–09, 312 (5th Cir. 1986). The court held that "[a]ny deliberate impediment to access, *even a delay of*

*access*, may constitute a constitutional deprivation." *Id.* at 311 (emphasis added).

Similarly, in *Simkins v. Bruce*, the court held that the record supported a denial of the right of access where a mail room supervisor's affidavit confirmed that, "in accordance with her training," she held petitioner's legal mail for a year while he resided temporarily at a different facility to attend court proceedings. 406 F.3d 1239, 1242 (10th Cir. 2005). The court held that this conduct "[r]eflect[ed] a course of conduct deliberately undertaken," without "evidence of negligent omission or inadvertence" and accordingly constituted "intentional conduct violating plaintiff's right of access to the courts." *Id.* at 1242–43.

2.    There is no question that Mr. Taylor satisfies the "undue and active interference" test set forth in cases like these. Like in *Simkins*, the official action here was intentional and systematic. *See id.* Further, the government has conceded the facts predicate to finding such a violation: Mr. Taylor was "required to sign an agreement prohibiting [him] from disclosing information about the [Edgewood] program, subject to punishment under the Uniform Code of Military Justice," and "[t]hese restrictions were in effect until . . . 2006." Resp.–Appellee's Br. at 2–3, ECF No. 15; *Simkins*, 406 F.3d at

1243–44. Thus, as the government concedes, the executive branch used Mr. Taylor's secrecy oath to block his right to file a petition that had a reasonable basis in law and fact—not for days, as in cases like *Jackson*, or even a year like in *Simkins*—but for decades. *Silva*, 658 F.3d at 1103.

### C.   No compelling government interest justifies the executive's violation of Mr. Taylor's right of access.

The government may argue that because Mr. Taylor's secrecy oath may implicate national security interests, some balancing of the right of access is required. *See NAACP v. Button*, 371 U.S. 415, 444 (1963) (applying balancing test to First Amendment challenge).  In non-prisoner cases like this one,[9] courts analyze the fundamental right of access to the courts under a strict scrutiny test, and "only compelling state interests will justify such intrusions." *Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983); *see NAACP*, 371 U.S. at 438 ("The decisions of this Court have consistently held that only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms."); *Swekel*,

---

[9] Mr. Taylor is a veteran, not a prisoner.  Accordingly, the lower standard applied in some right-of-access cases involving prison regulations does not apply here.  *See Turner v. Safley*, 482 U.S. 78, 89–90 (1987).

119 F.3d at 1261 (right of access is "fundamental"); *see also Chambers*, 207 U.S. at 148.

The executive's conduct in this case comes nowhere near what is required to pass constitutional strict scrutiny. "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (citation omitted). "Put another way, so long as the government can achieve its interests in a manner that does not burden [the constitutional right at issue], it must do so." *Id.* Here, the government cannot assert any interest so compelling or any narrowing of policies that would justify completely stripping certain veterans of their constitutional rights of access to VA and court processes merely because those veterans had the misfortune of volunteering to participate in a now-infamous experimental program.

No one disputes that the government has an interest in maintaining the confidentiality of certain government programs. But that confidentiality interest cannot bar Mr. Taylor from petitioning the VA for benefits or accessing VA and court processes, because the government has no compelling interest in keeping a secret *from itself*. The disclosures that Mr. Taylor needs to make to apply for benefits—but could not because of his oath—were all within the

federal government framework.  As Mr. Taylor has emphasized for over a dec-
ade, "[t]he establishment of a procedure by which these type[s] of claim[s]
could be made within the VA system would protect the Veteran's due process
rights," and such a procedure "could easily protect national interests while al-
lowing for the processing of such claims."  Appx107.

It is evident that the government branch is sophisticated enough to cre-
ate or operate within procedures by which even claims involving the most
highly sensitive information can be adjudicated, because it has done so in other
contexts.  For example, it has developed procedures to protect the rights of
the targets of foreign electronic surveillance, physical search, and other inves-
tigative actions under the Foreign Intelligence Surveillance Act.[10]  Even de-
tainees at Guantanamo Bay are afforded rights under the Suspension Clause
to challenge the legality of their detentions via writ of habeas corpus, notwith-
standing the highly sensitive national security information and interests im-
plicated by such challenges.  *Boumediene*, 553 U.S. at 771.  If this nation can

---

[10] *See* Letter from Hon. Reggie B. Walton, Presiding Judge, U.S. Foreign In-
telligence Surveillance Court, to Hon. Patrick J. Leahy, Chairman, Senate
Committee on the Judiciary (July 29, 2013), https://www.fisc.uscourts.
gov/sites/default/files/Leahy.pdf.

afford constitutional protections to enemy combatants and suspected crimi-nals and agents abroad, it must extend fundamental constitutional protections to its veterans.

For similar reasons, abrogating any means for Edgewood participants to seek benefits is far from narrowly tailored. Narrow tailoring requires that a restriction go only as far as necessary to assure that "certain governmental functions . . . [can] operate." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 341 (2010); *see Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015). The executive could have created any number of confidential procedures to facili-tate these veterans' access to care and benefits through the VA, while also preserving its secrecy interests. But it created nothing at all and then threat-ened Mr. Taylor's liberty if he used those processes that did exist. It is difficult to conjure a worse violation than the executive's attempt to erase the memory of its unethical practices at Edgewood by isolating and excluding the veterans who volunteered to participate in that program.

### D.    The effective-date provisions of 38 U.S.C. § 5110(a) must yield to Mr. Taylor's constitutional rights.

In cases in which an otherwise constitutionally sound statute, regulation, or policy conflicts with a petitioner's right of access, courts have routinely held

that the proper remedy is to hold the provision unenforceable against the petitioner. *Bill Johnson's Rests.*, 461 U.S. at 749 (vacating enforcement order and remanding for further proceedings); *Pennington*, 381 U.S. at 670 (Sherman Act not enforceable "even though [the conduct at issue] intended to eliminate competition"); *Noerr*, 365 U.S. at 136 (Sherman Act did not apply where it would bar access); *see NAACP*, 371 U.S. at 439, 444–45 (state law unconstitutional as construed and applied by state's highest court because "regulatory measures . . . no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights" (citation omitted)).

For example, in *Hull*, the Court held that prison regulation and official conduct violated a prisoner's right of access by blocking him from filing a petition for writ of habeas corpus. 312 U.S. at 549. The prison officials refused to notarize and intercepted copies of the prisoner's petition and justified that conduct with a prison regulation mandating that prisoners first submit any such writ to state officials for pre-approval. *Id.* at 547–49. The Supreme Court held the regulation invalid because "the state and its officers may not abridge or impair" the right of a prisoner to file a petition. In doing so, it preserved the traditional and vital role of the courts, by holding that the issue of

"[w]hether a petition . . . addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine." *Id.* at 549.

Similarly, in *Johnson v. Avery*, the Court held unconstitutional a prison practice of prohibiting mutual assistance among inmates in preparing habeas petitions, particularly assistance to illiterate or poorly educated prisoners, where doing so effectively barred these prisoners' ability to prepare a petition. 393 U.S. 483, 486–87, 489–90 (1969). The Court held that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners." *Id.* at 490.

Mr. Taylor—a veteran of a foreign war and a victim of his own countrymen—has received even *less* than the level of process deemed constitutionally deficient in *Hull* and *Johnson*. Although the prisoners in *Hull* and *Johnson* had their access blocked by state officials, neither risked court martial or criminal prosecution for pursuing their petitions.

Mr. Taylor's secrecy oath compelled him to suffer in total silence. *See* S. Rep. No. 94-755, at 418 (1976). There is no board to which Mr. Taylor could

have applied for permission to file his petition for benefits or seek assistance in preparing a claim that did not disclose secret information. He could not seek alternative relief from the Secretary of Veterans Affairs without violating his oath. He could not even disclose that he participated in human experiments in order to seek the health care promised by Army regulations, much less to file his claim with the VA seeking disability benefits or challenge the VA's determinations in court.

There is no question that the executive actually injured Mr. Taylor by preventing him from petitioning the government for 35 years' worth of benefits. *Casey*, 518 U.S. at 349–54 (discussing actual injury requirement). The executive branch barred every possible avenue of redress—and as to the 35 years of benefits of which the executive has deprived him, the executive to this day uses its own systemic and immoral conduct to continue to block that redress and frustrate Congress's intent. The executive has thereby ensured that Mr. Taylor has never, to this day, had a fair opportunity to access the three and a half decades of benefits that he earned.

In short, the government restrained the very speech that it simultaneously made a precondition to access VA and court processes in 38 U.S.C.

64

§ 5110(a). To the extent that 38 U.S.C. § 5110(a)'s effective-date provision required disclosure of the very information that the government simultaneously forbade Mr. Taylor from disclosing, the statute is unconstitutional as applied to veterans like Mr. Taylor. The government-imposed secrecy oaths and lack of alternative procedures barred these veterans from meeting the government-imposed requirements for access.

The Court should accordingly hold (1) that the government "may not abridge or impair" the right of veterans subject to secrecy oaths from petitioning the government for lawful entitlements and accessing court processes as to those entitlements, *Hull*, 312 U.S. at 549; and (2) that "unless and until the [government] provides some reasonable alternative" to allow these veterans access to VA and court processes, "it may not validly enforce" the effective-date provisions of § 5110(a) as to these individuals, *Johnson*, 393 U.S. at 490. The Court should order the VA on remand to expeditiously process Mr. Taylor's claim for service-connected benefits, with an effective date of September 7, 1971.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Mr. Taylor is an honorably discharged veteran. The executive branch subjected him to horrific human experiments at Edgewood Arsenal, causing

injuries that were then exacerbated by two combat tours in Vietnam.  In the three and a half decades that followed, the executive threatened his liberty if he disclosed his experiences to his doctors, the VA, or the courts.  It now seeks to benefit from that misconduct by denying Mr. Taylor 35-years' worth of benefits that Congress appropriated to him and shackling the Court from doing anything about it.

The normal operation of our three branches of government is critical to ensuring that the government acts with decency, honor, and respect.  When the executive dislocates that normal operation as to *both* of its co-equal branches—Congress and the courts alike—both centuries-old equitable powers and the Constitution grant the Court the power and the obligation to correct that imbalance.  As much or more than any case to come before this Court, that must happen here.

The judgment of the Veterans Court should be reversed and Mr. Taylor's service-connected disability claim should be given an effective date of September 7, 1971.

September 20, 2021                    Respectfully submitted,

                                             /s/ *Liam J. Montgomery*
                                             LIAM J. MONTGOMERY

*PRINCIPAL ATTORNEY*

CHARLES L. MCCLOUD

ANNA HROM

TIMOTHY PELLEGRINO

WILLIAMS & CONNOLLY LLP

*725 Twelfth Street, N.W.*

*Washington, DC 20005*

*Phone: (202) 434-5030*

*Fax: (202) 434-5029*

*E-mail: LMontgomery@wc.com*

MARK B. JONES*

MARK B. JONES ATTORNEY AT LAW

*1203 Michigan Street*

*Sandpoint, Id 83864*

*Phone: (208) 263-0886*

*E-mail: thessaguy@hotmail.com*

*Entry of Appearance Forthcoming

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Liam J. Montgomery, counsel for Appellant and a member of the Bar of this Court, certify, pursuant to Federal Circuit Rule 32(b)(1), that the attached En Banc Brief of Claimant–Appellant is proportionally spaced, has a typeface of 14 points or more, and contains 13,885 words.


SEPTEMBER 20, 2021                    /s/ *Liam J. Montgomery*    
                                     LIAM J. MONTGOMERY

## CERTIFICATE OF SERVICE

I, Liam J. Montgomery, counsel for Appellant and a member of the Bar of this Court, certify that, on September 20, 2021, a copy of the attached En Banc Brief of Claimant–Appellant was filed with the Clerk and served on the parties through the Court's electronic filing system.  In addition, I certify that copies of the En Banc Brief of Claimant–Appellant will be sent, via third-party commercial carrier for delivery overnight, to the Clerk and to the following counsel:

William James Grimaldi
Department of Justice, Commercial Litigation Branch, Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044

SEPTEMBER 20, 2021                    /s/ *Liam J. Montgomery*
                                     LIAM J. MONTGOMERY