No. 19-2211

# In the United States Court of Appeals for the Federal Circuit

_____

BRUCE R. TAYLOR, CLAIMANT–APPELLANT,

*v.*

DENIS MCDONOUGH, SECRETARY OF VETERANS AFFAIRS, RESPONDENT–APPELLEE.

_____

*Appeal from the United States Court of Appeals for Veterans Claims in Vet. App. No. 17-2390, Judge William S. Greenberg, Judge Amanda L. Meredith, and Judge Joseph L. Falvey, Jr.*

_____

## EN BANC REPLY BRIEF OF CLAIMANT–APPELLANT

_____

MARK B. JONES
MARK B. JONES ATTORNEY AT LAW
*1203 Michigan Street*
*Sandpoint, Id 83864*
*Phone: (208) 263-0886*
*E-mail: thessaguy@hotmail.com*

LIAM J. MONTGOMERY
CHARLES L. MCCLOUD
D. SHAYON GHOSH
ANNA HROM
TIMOTHY PELLEGRINO
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.*
*Washington, DC 20005*
*Phone: (202) 434-5030*
*E-mail: LMontgomery@wc.com*

*Attorneys for Claimant–Appellant*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 2

I.    Estoppel prevents the government from benefiting from its own affirmative misconduct. .......................................................... 2

     A.    Courts can estop the government in cases of affirmative misconduct. ........................................................................ 3

     B.    Separation of powers does not bar relief; it *mandates* it. ............... 6

         1.    *Richmond* and *McCay* support Mr. Taylor's position, not the government's. .................................................... 7

         2.    Mr. Taylor satisfies all substantive economic requirements for relief and does not seek relief that conflicts with a federal statute. ................................. 12

     C.    The government's arguments run headlong into the veterans' canon. ..................................................................... 18

II.   The government violated Mr. Taylor's right of access. ....................... 18

     A.    The government misstates the applicable legal standards. .......... 19

         1.    Specific intent is not required to hold that the government violated Mr. Taylor's constitutional right of access. ................................................................ 19

         2.    This Court's exercise of judicial review honors—not offends—separation-of-powers principles. ........................ 22

     B.    Mr. Taylor's right-of-access claim meets the Supreme Court's requirements in *Christopher v. Harbury* ........................ 23

     C.    The executive barred Mr. Taylor's access to VA processes and the courts in violation of his constitutional rights. ................ 25

     D.    The government's justification for its conduct withers under strict scrutiny. .................................................................. 29

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...................... 32

# TABLE OF AUTHORITIES

Page

## CASES

*AF v. Nicholson*, 168 F. App'x 406 (Fed. Cir. 2006)..................................14

*Armour & Co. v. Wantock*, 323 U.S. 126 (1944)..............................8, 10

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983)......................29

*Brush v. Office of Personnel Management*,
    982 F.2d 1554 (Fed. Cir. 1992).........................................*passim*

*Buckley v. Valeo*, 424 U.S. 1 (1976).............................................. 9

*Christopher v. Harbury*, 536 U.S. 403 (2002)..........................*passim*

*Defy Ventures, Inc. v. U.S. Small Business Administration*,
    469 F. Supp. 3d 459 (D. Md. 2020)................................. 10, 11

*Ex parte Hull*, 312 U.S. 546 (1941) ...........................................29

*Fano v. O'Neill*, 806 F.2d 1262 (5th Cir. 1987) ......................... 10, 11

*FDIC v. Hulsey*, 22 F.3d 1472 (10th Cir. 1994) ..............................13

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) .................. 30, 31

*Harbury v. Deutsch*, 244 F.3d 956 (D.C. Cir. 2001) ..........................20

*Harbury v. Deutsch*,
    No. 99-5307, 2002 WL 1905342 (D.C. Cir. Aug. 19, 2002)............................20

*Heckler v. Community Health Services of Crawford County, Inc.*,
    467 U.S. 51 (1984)................................................................... 6

*Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428 (2011)................. 17, 18

*Hospedale v. Shulkin*,
    No. 16-3360, 2018 WL 794875 (Vet. App. Feb. 9, 2018) .................27

*Illinois v. Lidster*, 540 U.S. 419 (2004) .................................8, 10

*Johnson v. Avery*, 393 U.S. 483 (1969).........................................29

*Leonard v. Nicholson*, 405 F.3d 1333 (Fed. Cir. 2005).........................15

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).........................1, 22

*Martin v. O'Rourke*, 891 F.3d 1338 (Fed. Cir. 2018) ........................12

*McCay v. Brown*, 106 F.3d 1577 (Fed. Cir. 1997)...........................*passim*

*NAACP v. Button*, 371 U.S. 415 (1963)........................................29

*Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990).....*passim*

*Ramirez-Carlo v. United States*, 496 F.3d 41 (1st Cir. 2007)......................5

*Roberson v. Principi*, 251 F.3d 1378 (Fed. Cir. 2001) ........................16

*Silva v. Di Vittorio*, 658 F.3d 1090 (9th Cir. 2011) ...........................22

*Simkins v. Bruce*, 406 F.3d 1239 (10th Cir. 2005)............................20

*Snyder v. Nolen*, 380 F.3d 279 (7th Cir. 2004).................................22

ii

Page

Cases—continued:

*Taylor v. McDonough*, 3 F.4th 1351 (Fed. Cir. 2021) .............................. 11, 16, 17
*Taylor v. Wilkie*, 31 Vet. App. 147 (2019) ............................................ 4, 16
*United States v. Cox*, 964 F.2d 1431 (4th Cir. 1992) .................................. 10, 11
*United States v. Oregon*, 366 U.S. 643 (1961) ......................................... 16, 18
*United States v. Windsor*, 570 U.S. 744 (2013) ........................................ 13
*Vietnam Veterans of America v. Central Intelligence Agency*,
    No. C 09-0037 CW, 2013 WL 3855688 (N.D. Cal. July 24, 2013) ................... 6
*Vietnam Veterans of America v. Central Intelligence Agency*,
    No. C 09-0037 CW, 2013 WL 6092031 (N.D. Cal. Nov. 19, 2013) ........ 4, 6, 30
*Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) ................................ 5, 10, 11
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .......................... 7
*Zacharin v. United States*, 213 F.3d 1366 (Fed. Cir. 2000) ................................. 3

## CONSTITUTION AND STATUTES

U.S. Constitution
    art. I, § 7, cl. 1 ................................................................. *passim*
    art. III ........................................................................ 23
38 U.S.C.
    § 1110 ...................................................................... 12, 15
    § 5103A ...................................................................... 16
    § 5104A ...................................................................... 16
    § 5107 ...................................................................... 16, 17
    § 5110 ...................................................................... *passim*

## OTHER AUTHORITIES

Restatement (Second) of Torts § 894 cmt. b (Am. Law Inst. 1979) ............... 5, 6
S. Rep. No. 94-755 (1976) ...................................................... 4

## INTRODUCTION

It is said that hard cases make bad law.  But this is not a hard case.  It raises a simple question of whether courts can intervene to ensure that the executive's affirmative misconduct does not deny a veteran the relief Congress intended him to receive.  Whether under a theory of estoppel, or under the constitutional right of access, the answer is emphatically, "Yes."

It is only the government that is attempting to make this a hard case.  It does so by advancing bad law in its brief, which urges upon the Court arguments that are variously wrong, internally contradictory, heartless, or some combination of all three.

The government is wrong that "separation of powers" prevents this Court from correcting executive misconduct.  As the panel opinion correctly held, estoppel is appropriate under the Supreme Court's and this Court's precedents.  But for the executive's affirmative misconduct, Mr. Taylor would have received in 1971 the benefits Congress appropriated for him.  Applying estoppel to this case does not violate "separation of powers."  It vindicates it.

The government compounds its error in asserting that it did not violate Mr. Taylor's right of access.  It invents a legal standard that would effectively insulate any deprivation of the right.  In fact, ignoring *Marbury v. Madison*

itself, the government goes so far as to argue that courts *cannot* police separation of powers without violating separation of powers. These arguments defeat themselves. Under the actual standard for a right-of-access claim, Mr. Taylor easily meets every requirement. The Court can and should remedy this violation by declaring 38 U.S.C. § 5110(a) unconstitutional as applied to this case.

A unanimous panel of this Court arrived at the only supportable result: that Mr. Taylor is entitled to an earlier effective date. Whether by way of estoppel, constitutional right of access, or both, the en banc Court should do the same.

## ARGUMENT

### I.    Estoppel prevents the government from benefiting from its own affirmative misconduct.

For 35 years, the government threatened Mr. Taylor with criminal prosecution if he discussed his experiences at Edgewood with anyone, including the government itself. When the government finally abated that threat in 2006, it freed Mr. Taylor to seek the disability benefits Congress legislated for him, effective on the date his claim ripened: the date of his discharge.

Cloaking itself in lofty rhetoric about the Constitution, separation of powers, and the Appropriations Clause, the government steadfastly resists

granting Mr. Taylor what Congress intended him to receive. Instead, the government asks the Court to enshrine a version of the Constitution that would permit the executive to trample on Congress's intent and then shield such actions from any effective review. Thankfully, that is not the Constitution the Founders created. This Court can estop the government in these circumstances.

### A. Courts can estop the government in cases of affirmative misconduct.

1. The government does not meaningfully dispute that the Veterans Court can equitably estop litigants. *See* Taylor Br. at 25–28.[1] Nor does it seriously challenge that courts can estop the government in cases of affirmative misconduct, a proposition recognized by every circuit. *See Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000). According to the government (at 28), however, Mr. Taylor is not entitled to relief because "there has been no corresponding finding of [affirmative] misconduct, and the record has not been developed for such a finding." The government seems to claim that the oath that hid a secret human testing program amounted to nothing more than an effort to preserve national security. This contention beggars the imagination.

---

[1] All citations refer to the parties' en banc briefing unless otherwise noted.

Despite fifteen years of litigation, the pertinent facts remain undisputed. Mr. Taylor signed a secrecy oath that threatened him with criminal prosecution if he discussed his experiences with anyone. *See Taylor v. Wilkie*, 31 Vet. App. 147, 149 (2019). Because of his oath, he could not get help for the harms his time at Edgewood caused him. Appx077. And the government failed to provide alternative forums for relief despite knowing that veterans were forgoing treatment out of fear of criminal prosecution. *See Viet. Veterans of Am. v. Cent. Intel. Agency*, No. C 09-0037 CW, 2013 WL 6092031, at *6–8 (N.D. Cal. Nov. 19, 2013) (subsequent history omitted). No further factual development—read, delay—is necessary.

The government's invocations of Cold War national security only further diminish its arguments. No one disputes the government's interest in maintaining national security. But the government was not defending such an interest in this case. As the government (at 51) acknowledges, stopping Mr. Taylor from getting benefits did not stop the Soviets from learning about what the executive was doing at Edgewood. *See* S. Rep. No. 94-755 (1976). And were Cold War national security really the point, the government could have released Mr. Taylor from his oath when the Cold War ended, fifteen years before it actually did so. *See* Appx032. But that did not occur, and history

4

makes plain why:  The chemical experiments at Edgewood were abhorrent, with leaders at all levels flouting well-established moral and ethical standards for human testing.  Secrecy oaths were merely one of several ways in which the United States sought to close this embarrassing chapter of American history.

2.  After ignoring the facts it does not dispute, the government (at 26, 28) constructs a barrier to relief.  In the government's view, Mr. Taylor can only prevail if he can prove—in a litigation regime where there is no discovery and therefore no opportunity to depose any witnesses or obtain any government documents—that the government possessed the specific intent to deprive Mr. Taylor of his benefits.  That standard finds no support in the case law, which recognizes that the government can engage in affirmative misconduct even if it did not "intend to mislead a party."  *Ramirez-Carlo v. United States*, 496 F.3d 41, 49 (1st Cir. 2007) (quoting *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc)).  The central inquiry in estoppel is, instead, whether the speaker "had reason to believe that the other might act upon his statement."  Restatement (Second) of Torts § 894 cmt. b (Am. Law Inst. 1979).  Accordingly, estoppel can apply even when "the one making the representation believes that his statement is true," and even if "the person making the

representation exercised due care in making the statement." *Id.* However incredible they may be, the government's professions of good intentions are irrelevant.

Even if intent were required, Mr. Taylor has shown it. There is no dispute that the executive intended the secrecy oath to obtain Mr. Taylor's silence. And the Edgewood Program was not merely isolated negligence. Far from it. It resulted from a concerted, decades-long effort by multiple executive departments that prevented scores of veterans from receiving congressionally mandated benefits. *See Viet. Veterans of Am.*, 2013 WL 6092031, at *2; *Viet. Veterans of Am. v. Cent. Intel. Agency*, No. C 09-0037 CW, 2013 WL 3855688, at *26 (N.D. Cal. July 24, 2013). The executive's conduct fell far short of the "minimum standard of decency, honor, and reliability" our citizens can and should expect from our government. *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 61 (1984).

## B.    Separation of powers does not bar relief; it *mandates* it.

When the executive engages in egregious misconduct—as, for example, by covering up a gross abuse of our soldiers—the separation-of-powers concerns animating *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990) and *McCay v. Brown*, 106 F.3d 1577 (Fed. Cir. 1997) militate in favor

6

of, not against, court intervention. That is because when the executive affirmatively thwarts Congress's intent, no less than "the equilibrium established by our constitutional system" is at stake. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

### 1. *Richmond* and *McCay* support Mr. Taylor's position, not the government's.

a. The government (at 19) erroneously relies on *Richmond* and *McCay* for the proposition that even in cases of affirmative misconduct, "equitable estoppel is not available to grant a money payment where Congress has not authorized such a payment." That is, according to the Department of Justice, *no matter what the executive does*, this Court cannot estop the government if public funds are at issue.

To put this in perspective, the government argues that it could falsify records, destroy documents, or physically restrain a claimant without risking estoppel. Or, to use the government's own formulation (at 33), this Court would itself "violate the separation of powers" if it were "to correct the Executive Branch's alleged violation of the separation of powers." The Founders could not have intended, and did not intend, the *Appropriations Clause* to have such far-reaching effect.

The Supreme Court has never said otherwise. Unlike Mr. Taylor, the

claimant in *Richmond* was the victim of simple government negligence. *See Richmond*, 496 U.S. at 416–17, 428. The Court repeatedly characterized the executive's misconduct in that light, *see id.*, meaning the Court did not consider whether a court can estop the executive in cases of affirmative misconduct, *see* Taylor Br. at 31–32. No subsequent case has either.

b. Thus, *Richmond*'s actual *holding* concerns whether the Appropriations Clause prevents a court from estopping the government when the executive has engaged in negligent conduct. Conversely, then, the isolated passages the government trumpets (at 14–16, 19) for the proposition that estoppel can *never*—ever—lie in cases that involve public funds are inapposite. The Supreme Court repeatedly instructs that "general language in judicial opinions" should be read "as referring in context to circumstances *similar to the circumstances then before the Court* and not referring to quite different circumstances that the Court was not then considering." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (emphasis added). That is because "[g]eneral expressions transposed to other facts are often misleading." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944).

The executive's conduct here is miles apart from *Richmond* and *McCay*.

*Richmond* involved isolated, innocent misrepresentations by low-level government agents that affected one individual. 496 U.S. at 417. The government (at 13–14) attempts to duck this reality by noting that this Court originally concluded the claimant in *Richmond* was the victim of affirmative misconduct. But the Supreme Court did not adopt that finding, and its recitation of the facts suggests it would not have done so. *See Richmond*, 496 U.S. at 415–18. In the Supreme Court's view, *Richmond* involved "incorrect advice," nothing more. *Id.* at 417. The same is true of *McCay*, which concerned a veteran who did not apply for benefits because the government had—as part of a legitimate, though misguided, policy—denied any connection between Agent Orange and cancer. 106 F.3d at 1581. These cases are plainly not on point with the conduct at issue here.

What is more, the separation-of-powers concerns here differ sharply from those in *Richmond*. Rather than making an innocent error, the executive *affirmatively thwarted Congress's intent. See Buckley v. Valeo*, 424 U.S. 1, 122 (1976) ("checks and balances" constitute "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other"). Here, more than in most cases, the government's invitation to carelessly extend *Richmond* and *McCay* to this materially different set of

9

facts would amount to the sort of improper legal reasoning the Supreme Court prohibits. *Lidster*, 540 U.S. at 424; *Armour & Co.*, 323 U.S. at 133.

c.  The government (at 25) similarly claims Mr. Taylor did "not identify any case in which a court estopped the [g]overnment in a claim involving public money." Not so.  Although neither *Watkins* nor *Fano v. O'Neill*, 806 F.2d 1262 (5th Cir. 1987) involved a single step between estoppel and the public fisc, both unquestionably prompted the expenditure of congressionally appropriated funds.  After all, Sergeant Watkins's reenlistment entitled him to the full pay and benefits of military service.  875 F.2d at 701–05.  Fano was similarly entitled to the federal benefits any other permanent resident would enjoy.  806 F.2d at 1263.  And public funds were likewise at issue in both *United States v. Cox*, 964 F.2d 1431, 1434–35 (4th Cir. 1992) and *Defy Ventures, Inc. v. U.S. Small Business Administration*, 469 F. Supp. 3d 459, 479 (D. Md. 2020).  Yet in both cases, the courts concluded *Richmond* did not bar the particular relief at issue.

As with Mr. Taylor, in each of these cases, Congress appropriated funds for specific purposes—whether it be military pay and benefits, federal entitlement payments, litigation expenses, or Paycheck Protection Program funding—and the executive took some action to thwart that appropriation.  In each

of these cases, the courts prevented the executive from frustrating congressional intent despite the fact that public monies were at stake. Mr. Taylor asks for the same thing. He "seeks an earlier effective date—his date of discharge—through a 'long recognized' common-law adjudicatory tool, estoppel." *Taylor v. McDonough*, 3 F.4th 1351, 1369 (Fed. Cir. 2021) (citation omitted). He asks that the Court *prevent* the government from parlaying its affirmative misconduct into a benefit for itself. A payment would result to Mr. Taylor, but that payment would be no different than the payments that resulted from the orders in *Watkins*, *Fano*, *Cox*, or *Defy Ventures*.

Finally, this Court in *Brush v. Office of Personnel Management* awarded the petitioner monetary relief after thoughtfully and carefully considering *Richmond* and its progeny. 982 F.2d 1554, 1558, 1561–64 (Fed. Cir. 1992). Although *Brush* involved waiver and not estoppel, if the Appropriations Clause erected the impenetrable barrier the government claims, the holding in *Brush* would have been impossible. But the Court held that relief was not impossible there. The government is wrong that it is impossible here.

d. The government (at 41–42) reassures the Court that it should not worry about the consequences of the government's proposed rule because Congress can supposedly fix the problem. This solution, however, provides

11

cold comfort.

Requiring direct congressional action would amount to an insurmountable hurdle for Mr. Taylor—a seventy-year-old veteran who suffers from multiple physical and mental ailments. *See* Appx028. And such a requirement would also be inappropriate. It essentially means asking Congress to enact an ad-hoc solution to a separation-of-powers conundrum the executive created, even though Congress *already* expressed its intent to give benefits to Mr. Taylor and veterans like him. *See* 38 U.S.C. § 1110; *Martin v. O'Rourke*, 891 F.3d 1338, 1341 (Fed. Cir. 2018) ("Veteran's disability benefits are *nondiscretionary, statutorily mandated benefits . . . .*" (emphasis added) (citation omitted)).

### 2. Mr. Taylor satisfies all substantive economic requirements for relief and does not seek relief that conflicts with a federal statute.

*Richmond* and, by extension, *McCay* are only implicated if (a) the claimant does not satisfy all substantive economic requirements for relief and (b) that relief would directly conflict with a federal statute. *See Brush*, 982 F.2d at 1562–63. Mr. Taylor is asking for nothing more than what Congress intended him to receive, and "the award [he] seeks [is not] in direct contravention of [a] federal statute." *Richmond*, 496 U.S. at 424.

a. The government contends that 38 U.S.C. § 5110(a) ends the inquiry,

and implies (at 19–23) that Mr. Taylor's contrary arguments improperly elevate statutory purpose over text. But the government misstates Mr. Taylor's argument and misconstrues the test that applies when considering whether the award he seeks would contravene § 5110. *See Richmond*, 496 U.S. at 424.

The standard is not, as the government contends, simply whether the claim for relief would directly conflict with the text of an isolated provision in a larger statutory scheme. That is, the Court cannot resolve this appeal by looking at § 5110(a) to the exclusion of the rest of the veterans' benefits scheme. Instead, the Court must discern Congress's intent as expressed in the statutory scheme as a whole. *See Brush*, 982 F.2d at 1562–63. Congress's goals when enacting the statute and how the statute works in practice are thus relevant to the inquiry. *See id.*; *see also United States v. Windsor*, 570 U.S. 744, 771 (2013) (statute's "operation in practice confirms [its] purpose"). Estoppel remains permissible so long as relief would "not frustrate the purpose of the statutes expressing the will of Congress or unduly undermine the enforcement of the public laws." *FDIC v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994).

Any contrary rule would produce absurd results. The Appropriations Clause does not grant the executive carte blanche to engage in misconduct that

frustrates Congress's express intent whenever that misconduct manages to save the government a few dollars. To the contrary, if the Appropriations Clause is to have any meaning, it is that the executive cannot thwart Congress's intent when it comes to spending decisions. If not the courts, then who is to police that line? In the government's view, no one. But that clearly is not the law.

When viewed through this lens, estoppel is not just permissible here; it is required. Common sense dictates that Congress wrote § 5110 with the presumption that veterans are free to file at any time. *See* Taylor Br. at 39–41. If that is true, as it usually is, § 5110 may limit any retroactive relief. *See, e.g.*, *McCay*, 106 F.3d at 1581; *see also AF v. Nicholson*, 168 F. App'x 406, 408 (Fed. Cir. 2006). When the government actively stands in the way of that, however, estoppel does not act in "direct contravention of [a] federal statute"; rather, it upholds the statutory scheme. *Richmond*, 496 U.S. at 424.

In rejecting this straightforward analysis, the government (at 34) asserts that the *McCay* claimant's "choice [not to file for benefits] is irrelevant to the *Richmond* analysis, which hinges entirely upon [separation-of-powers] concerns." But this contention simply rehashes the government's prior mer-

itless arguments about *Richmond*'s scope. *See supra* pp. 7–10. Worse, it overlooks the fact that *Richmond* is only implicated if the relief *directly conflicts* with the statute at issue, a conclusion this Court made plain in *Brush*. *See* 982 F.2d at 1562. Simply put, the *McCay* claimant had an opportunity that was never available to Mr. Taylor. That opportunity makes all the difference here.[2]

A cursory review of the veterans' benefits scheme is all that is necessary to conclude that relief here does not directly conflict with what Congress intended. This grateful nation "*will pay* [compensation] to any veteran" that is injured in its service. 38 U.S.C. § 1110 (emphasis added). To achieve that result, Congress designed a veterans' benefits scheme that consistently favors veterans. Not only is the VA statutorily *required* to assist veterans in filing claims, but doubts as to those claims are to be resolved in the veteran's favor; in all but the most unusual of circumstances, favorable findings are not subject

---

[2] In a footnote, the government (at 22 n.5) cites *Leonard v. Nicholson*, 405 F.3d 1333 (Fed. Cir. 2005) for the proposition that "the assignment of an earlier effective date cannot be separated from the award of retroactive monetary benefits." But that is beside the point. Like the plaintiff in *Leonard*, Mr. Taylor does not dispute that an earlier effective date will have the effect of awarding him monetary compensation. The question before the Court is whether Mr. Taylor, by requesting compensation, is "ask[ing] for anything that Congress did not intend for the statute to provide." *Brush*, 982 F.2d at 1563. Because he is not, the Appropriations Clause does not bar relief.

to appeal. *Id.* §§ 5103A, 5104A, 5107; *see also Roberson v. Principi*, 251 F.3d 1378, 1383 (Fed. Cir. 2001) (VA must "fully and sympathetically develop the veteran's claim to its optimum before decision on its merits" (citation omitted)).

Together, these provisions speak pointedly to Congress's "solicitude . . . for veterans." *United States v. Oregon*, 366 U.S. 643, 647 (1961). The legislature broadly authorized relief to those veterans like Mr. Taylor who sacrificed their minds and their bodies for this country. It would have intended Mr. Taylor to receive relief as of 1971 and surely would not have anticipated that the *Appropriations Clause* would stand in the way.

b. Perhaps most incredibly, the government (at 39) seems to imply that Mr. Taylor may not have been granted benefits in a but-for world in which he applied in 1971. But as both the Panel and the dissenting Veterans Court judge already noted when faced with similar reasoning, this contention is, in a word, "heartless." *Taylor*, 3 F.4th at 1373 n.14 (quoting *Taylor*, 31 Vet. App. at 158 (Greenberg, J., dissenting)). Having deprived Mr. Taylor of the ability to apply for benefits at that time, the law does not permit the government to declare victory because Mr. Taylor cannot fully reconstruct a but-for world from 50 years ago. Instead, as a unanimous panel of this Court correctly noted,

*Taylor*, 3 F.4th at 1368, Mr. Taylor need only demonstrate that he meets the "substantive economic criteria of the statute," *Brush*, 982 F.2d at 1562.

As such, when this Court in *Brush* considered whether *Richmond* barred relief, the Court asked whether "all substantive economic requirements [for relief had] been met" (*i.e.*, whether the litigant was "ask[ing] for anything that Congress did not intend for the statute to provide"). *Id.* at 1563. Because the litigant was not asking for anything the statute would not ordinarily have provided, the relief she sought did not violate the Appropriations Clause. *See id.*

The same is true here. Mr. Taylor is an honorably discharged veteran who was injured during his service. *See* Appx039–043; Appx055–063; Appx064; Appx073–076. Had Mr. Taylor been able to apply for benefits in 1971, there is no reasonable question that he would have met "the economic requirements of the statute," *Brush*, 982 F.2d at 1562, particularly in light of both the benefit-of-the-doubt standard, 38 U.S.C. § 5107(b), and the pro-veteran canon, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 441 (2011). That is, he "has not asked for anything that Congress did not intend for the statute to provide and for which he has not met all of the substantive requirements." *Taylor*, 3 F.4th at 1369 (cleaned up). The Appropriations Clause does

17

not bar relief; it requires it. *See Brush*, 982 F.2d at 1562.

### C.     The government's arguments run headlong into the veterans' canon.

It is not necessary to invoke the veterans' canon in this case, but the Court is more than entitled to do so. *See* Taylor Br. at 47–49.

In contending otherwise, the government (at 39–41) fails to appreciate that the canon informs nearly every aspect of veterans law. *See supra* pp. 15–16. As the Supreme Court bluntly put it, Congress has "place[d] a thumb on the scale in the veteran's favor." *Henderson*, 562 U.S. at 440 (citation omitted); *see* Am. Legion Br., ECF No. 55; Nat'l L. Sch. Vets. Clinic Consortium Br., ECF No. 63.

The injustices here are palpable. The very organization Congress created to look after those like Mr. Taylor—a man who has borne the battle—is using its own misconduct to deprive him of the solicitude the law grants him. This Court can and should intervene. After all, that is surely what Congress would have intended. *See Oregon*, 366 U.S. at 647 ("The solicitude of Congress for veterans is of long standing.").

## II.     The government violated Mr. Taylor's right of access.

The executive's secrecy oath violated Mr. Taylor's constitutional right of

access by prohibiting Mr. Taylor from applying for his congressionally mandated benefits.  Rather than engage on this critically important issue, the government instead invents legal standards for right-of-access claims and offers only scattershot and internally inconsistent arguments.  Under the correct standards, the government unconstitutionally denied Mr. Taylor access.

### A.    The government misstates the applicable legal standards.

Although the government purports to apply *Christopher v. Harbury*, 536 U.S. 403 (2002), it both misstates the Court's ruling and, astoundingly, relies on quotations from the opinions that *Christopher* expressly overturned. Again misunderstanding the constitutional framework, the government also argues that holding a statute unconstitutional as applied to Mr. Taylor would create a "[separation-of-powers] problem."  These arguments are deeply flawed.

### 1.    Specific intent is not required to hold that the government violated Mr. Taylor's constitutional right of access.

The government contends (at 42–59), first, that it cannot have violated Mr. Taylor's constitutional rights unless the executive acted "for the very purpose of protecting government officials from suit" or with the express intention "to deprive [Mr. Taylor] of his disability benefits."  The government (at

43–48, 54–55) conjures these supposed requirements not from *Christopher* itself, but from a tortured reading of the D.C. Circuit's denial of rehearing en banc in *Harbury v. Deutsch*, 244 F.3d 956 (D.C. Cir. 2001). But even were the government's reading of *Harbury* reasonable, *Harbury* is not good law: the Supreme Court reversed *Harbury*, 536 U.S. at 422, and the D.C. Circuit then vacated the underlying decision the government cites, *Harbury v. Deutsch*, No. 99-5307, 2002 WL 1905342, at *1 (D.C. Cir. Aug. 19, 2002).

In *Christopher*—the actual controlling decision—the Supreme Court said *nothing* about these supposed requirements. *Christopher* describes the government action required to sustain a right-of-access claim as "systemic" or "official" (as opposed to mere mistake or error). 536 U.S. at 413–15. Nowhere has the Supreme Court stated or even implied that the government must actually *intend to deprive* constitutional rights. *See Simkins v. Bruce*, 406 F.3d 1239, 1242 (10th Cir. 2005) (right-of-access claim did not require a "showing of malicious motive"). The government's conduct only has to be "intentional." *Id.*

This requirement follows from *Christopher*, which held that one need only "describe the official acts frustrating the litigation," *i.e.*, explain how gov-

ernment policies "shut [the litigant] out of court." 536 U.S. at 415. For example, *Christopher* discusses a line of "denial-of-access cases challenging filing fees that poor plaintiffs cannot afford to pay." *Id.* at 413 & n.8 (listing cases). All of these involved barriers to filing suit—the filing fees. But none of them required that the government have *specifically intended* the fees to violate anyone's constitutional rights by denying them access to the courts.

If that were the case, no indigent litigant could *ever* mount a right-of-access challenge, because courts routinely require filing fees. In the mine run of cases, those fees are entirely appropriate. It is only when the *effect* of the fee is to deny an indigent person access to the courts that a constitutional issue exists. So too here: Mr. Taylor does not argue that secrecy oaths are always unconstitutional or even that the government originally imposed the secrecy oath here in order to deny Mr. Taylor access to benefits (and to the court processes for enforcing those benefits). But because the effect of the oath was to deny Mr. Taylor access to the courts, the executive violated his constitutional rights.

Given that the Supreme Court in *Christopher* did not articulate the government's contrived standard, it is no surprise that the Courts of Appeals decisions the government cites (at 46, 52, 56–57) do not either. In *Silva v. Di*

21

*Vittorio*, the prisoner–petitioner stated a claim for denial of access because defendants allegedly had "seized and withheld all of his legal files," resulting in dismissal of "several of his pending suits." 658 F.3d 1090, 1104 (9th Cir. 2011). Although the petitioner alleged that the defendants intended to undermine his suits, the Ninth Circuit focused on the defendants' actions, not the defendants' motives. *Id.* at 1103–04. Similarly, in *Snyder v. Nolen*, the court emphasized the breadth of the constitutional right of access without any reference to the government's motivations. 380 F.3d 279, 291 (7th Cir. 2004); *see also id.* at 293 (Easterbrook, J., concurring in part) (noting that one clerk's isolated "mistake" did not create a constitutional violation).

In short, no law requires Mr. Taylor to prove that the executive acted maliciously or with specific intent "to preclude [him] from obtaining benefits." Gov't Br. at 54.

> **2.  This Court's exercise of judicial review honors—not offends—separation-of-powers principles.**

The Constitution is the "supreme law of the land," and "a law repugnant to the [C]onstitution is void." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803). Policing this line is "the very essence of judicial duty." *Id.* at 178. "It is emphatically the province and duty of the judicial department to say what the law is." *Id.* at 177.

Nevertheless, in the face of this reality taught on the first day of law school, the government (at 55, 57) argues that this Court *cannot* rule that 38 U.S.C. § 5110 is unconstitutional as applied to veterans like Mr. Taylor because it would create a "[separation-of-powers] problem" by "infringing upon [Congress's] control of public money." This assertion just rehashes the same meritless arguments about the scope of *Richmond*. If this notion were correct, no constitutional right-of-access claim could ever succeed—a right-of-access claim, by its nature, calls for judicial review of the executive or legislature's exercise of its powers.

The Constitution separates powers among *three* co-equal branches, not two. The document emphatically does *not* reserve to the executive the unreviewable province of applying Congress's laws however it sees fit, no matter how infirm that application may be. Rather, Article III empowers this Court to review the constitutionality both of Congress's statutes and the executive's execution of those laws and then to craft the necessary remedies. This does not, as the government contends, create any "[separation-of-powers] problem"; it *preserves* proper separation of powers.

## B.    Mr. Taylor's right-of-access claim meets the Supreme Court's requirements in *Christopher v. Harbury*.

The government (at 42) also contends that Mr. Taylor fails to meet two

of the requirements articulated in *Christopher*—identification of cognizable relief and notice. Here again, the government is wrong.

Preliminarily, *Christopher* requires only a (1) cognizable claim that (2) Mr. Taylor presented and for which (3) a constitutional remedy is necessary. *See* 536 U.S. at 414–16. On the first of these requirements, there can be no serious doubt that Mr. Taylor's claim for disability benefits is cognizable: He seeks veterans disability benefits that he was due but unable to claim for 35 years because of government interference. Taylor Br. at 53.

Mr. Taylor has also long presented his right-of-access claim. For a decade and a half, he has dutifully followed the benefit-claims procedures the law prescribes, bringing him finally to the en banc Court. From the outset of and throughout this process, Mr. Taylor has protested the denial of his right of access, thereby giving "fair notice" to the government of his right-of-access claim. *Christopher*, 536 U.S. at 416. For example, in his original 2007 Notice of Disagreement, he explained that he had been denied behavioral health assistance in service at Edgewood, Fort Benning, and twice in Vietnam, as well as after service, because his Edgewood records "were withheld due to secrecy requirements." Appx077. He further explained that he was "required at [Edgewood] Arsenal to sign secrecy agreements which precluded [him] from

discussing stressor incidents indefinitely" and was "constrained from filing for VA benefits by secrecy agreements until [he] received the VA letter" in 2006. Appx077. This compulsory veil of secrecy meant he "was precluded from obtaining disability benefits." Appx078; *see also* Appx104–111 (due process and denial of access claims presented to the Veterans Court).

Mr. Taylor likewise has demonstrated that the denial of that right of access prevents him from obtaining any effective remedy. He need only "identify a remedy that may be awarded as recompense but [that is] not otherwise available in some suit that may yet be brought." *Christopher*, 536 U.S. at 415. Mr. Taylor has done precisely that: He asks this Court to rule that the effective-date provisions of 38 U.S.C. § 5110 are unconstitutional as applied to veterans like himself. Taylor Br. at 64–66; *see also* Mil.-Vets. Advocacy Br., ECF No. 59; Nat. Vets. Legal Servs. Prog. Br., ECF No. 64.

### C. The executive barred Mr. Taylor's access to VA processes and the courts in violation of his constitutional rights.

The government's remaining responses are weak, disjointed, and internally inconsistent. The only reasonable conclusion is that the executive's systematic and intentional conduct violated his constitutional rights. Taylor Br. at 49–65.

1.  The government (at 9, 49, 51, 58) argues that the secrecy oath "can be construed as permitting a volunteer to discuss the Edgewood Program within the Government" because the sample oath "does not contain an explicit prohibition on discussing the Edgewood Program with Federal agencies such as the VA."  But military orders are not construed against their drafter; Mr. Taylor interpreted the oath in the way most beneficial to the government, as he was trained to do.  Moreover, the oath itself belies the government's argument, as it forbids disclosure of "any information related to U.S. Army Intelligence Center interest or participation in the Department of the Army Medical Research Volunteer Program to any individual, nation, organization, . . . or other group or entity, *not officially authorized to receive such information*."  Gov't Br. at 3 n.1 (emphasis added).

There is no indication that VA was "authorized to receive such information."  In fact, in one of many internal inconsistencies, the government elsewhere (at 10) contends that *even DoD* was not permitted to disclose information about the identities of participants "to VA while the program was classified."  *See* Gov't Br. at 52 (contending that DoD could not disclose participant information to VA because doing so would "defeat[] the point of classification").  In any event, if Mr. Taylor's secrecy oath had not barred him from

discussing health concerns or filing claims for benefits, VA would not have needed to send a letter releasing him from that oath in 2006. Gov't Br. at 3.

2. It also does not cure the constitutional violation that other Edgewood participants may have attempted to file claims or other lawsuits. *See* Gov't Br. at 49–51 (citing cases). The fact that these veterans were so desperate to obtain VA services and benefits that they willingly may have risked court martial in no way undermines Mr. Taylor's denial-of-access claim. *See* Gov't Br. at 2–3 (Edgewood participants "were required to sign an agreement prohibiting them from disclosing information about the program, subject to punishment under the Uniform Code of Military Justice"). The government identifies no support for the proposition that a veteran must risk such dire consequences to preserve a benefits claim.

Even if Mr. Taylor had done so, as the government concedes (at 48–51), any "minimal claim" he could have filed "likely would have been insufficient for Mr. Taylor to obtain service connection." *See, e.g., Hospedale v. Shulkin*, No. 16-3360, 2018 WL 794875, at *4 (Vet. App. Feb. 9, 2018) (government acknowledging in 2018 that the VA may have erroneously denied disability benefits to an Edgewood veteran who first sought them in 1979). Just so: To prove present disability and claim service connection, Mr. Taylor would have

had to disclose at least basic information about his participation at Edgewood, which his oath specifically forbids. Gov't Br. at 3 n.1 (oath forbidding disclosure of "any information related to . . . participation in" program). And this overlooks that when Mr. Taylor tried to get medical care, he was treated as a malingerer and liar. Appx062; *see* Appx058.

In other words, although the government contends that Mr. Taylor was always entitled to file incomplete paperwork requesting benefits that he would not receive (all while risking criminal charges), the government is ultimately noncommittal on whether filing a claim actually would have broken his oath or secured him an earlier effective date. *See* Gov't Br. at 48–49 (arguing that under 2006 regulation "*it is conceivable* that he could have received an earlier effective date" (emphasis added)); Gov't Br. at 51 ("the sample oath *can be construed* as permitting" disclosures within the government (emphasis added)).

Regardless, Mr. Taylor's secrecy oath had no expiration date, and he could have had no expectation of it being lifted in his lifetime. The government's contention that he should have filed a minimal claim in 1971 to preserve his right to eventually claim benefits in 2006—assuming he survived that long—is yet another of the government's heartless arguments that finds no

28

grounding in reality. Although we may never know their number, many Edgewood veterans who earned benefits through their service endured their suffering in silence to the end—having died before receiving the 2006 VA letter and having never broken their oaths.

The government may have outlasted these men and women, whether they filed a "minimal claim" or not. Thankfully, Mr. Taylor is not among them. But he carries the banner for all of them, and for that the government repays him with a miserly vision of the Constitution's guarantee of a right of access that bears no resemblance to the right the Supreme Court described in *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *Johnson v. Avery*, 393 U.S. 483, 485 (1969); *NAACP v. Button*, 371 U.S. 415, 444–45 (1963); *Ex parte Hull*, 312 U.S. 546, 549 (1941), or the *Noerr-Pennington* line of cases, all of which the government ignores. Applying the correct legal standards, the government's conduct violated Mr. Taylor's constitutional right of access.

### D. The government's justification for its conduct withers under strict scrutiny.

The government (at 47 & n.8) does not dispute that strict scrutiny applies to any abridgment of Mr. Taylor's right of access. *See* Taylor Br. at 58 & n.9; *see also* Taylor Br. at 58–61. The policies at issue "can survive strict scrutiny only if [they] advance[] 'interests of the highest order' and [are] narrowly

tailored to achieve those interests." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021) (citation omitted).  "[S]o long as the government can achieve its interests in a manner that does not burden [the constitutional right], it must do so." *Id.*

The government offers no coherent response to Mr. Taylor's argument that it has "no compelling interest in keeping a secret *from itself*." Taylor Br. at 59.  It starts with a strawman, arguing (at 52–54) that "[r]equiring DoD to make a wholesale disclosure of the names of everyone who participated in all classified program[s] defeats the point of classification," ignoring (1) its contrary argument (at 51) that Mr. Taylor himself could have disclosed his participation to VA without violating the oath; (2) the fact that in 2006, a full five years before DoD, *Vietnam Veterans of Am.*, 2013 WL 6092031, at *6, VA disclosed the names of participants—just what the government says VA could not do; and (3) its own concession (at 52–53) that the VA and DoD already work together on a classified benefits program for special operations forces.

The government (at 51) also blithely notes that "public scrutiny of the Edgewood Program dates back to at least 1976."  Perhaps the government is conceding what has been obvious all along: that there really never was any compelling government interest served by barring Mr. Taylor and others from

seeking VA services and benefits for decades. Regardless, none of these un-thinking hypotheticals cures the fundamental realities that (1) the executive swore Mr. Taylor to secrecy, (2) under threat of the severest of punishments, and (3) Mr. Taylor abided by that oath for three and a half decades, until VA itself saw fit to partially lift the obligation. *See also* Am. Civil Liberties Union Br., ECF No. 67.

Finally, the government effectively concedes that it never narrowly tai-lored the enforcement of its interest. Even as it admits (at 52–53) that it cre-ated alternative mechanisms for classified special forces programs, it admits that it never did so for veterans like Mr. Taylor. *See also* Taylor Br. at 60–61 (discussing other government procedures for adjudicating claims involving sensitive information). Instead, as one final affront, the government blames Mr. Taylor for failing to "identify an alternative benefits filing mechanism that does not defeat the point of classification." Gov't Br. at 56. But it is not Mr. Taylor's burden to prove or disprove narrow tailoring—it is the government's. *See Fulton*, 141 S. Ct. at 1881–82. It has never done so.

The executive actions that deprived Mr. Taylor's right of access to VA processes and the courts for decades do not survive strict scrutiny. The gov-ernment's interest is vague and unsupported, and until 2006 it made no efforts

to tailor its policies. This conduct violated Mr. Taylor's constitutional rights, and this Court is empowered to remedy this egregious wrong by declaring 38 U.S.C. § 5110 unconstitutional as applied to the facts of this case.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The judgment of the Veterans Court should be reversed, and Mr. Taylor's service-connected disability claim should be given an effective date of September 7, 1971.

December 6, 2021                    Respectfully submitted,

/s/ *Liam J. Montgomery*
LIAM J. MONTGOMERY
  *PRINCIPAL ATTORNEY*
CHARLES L. MCCLOUD
D. SHAYON GHOSH
ANNA HROM
TIMOTHY PELLEGRINO
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *Phone: (202) 434-5030*
 *Fax: (202) 434-5029*
 *E-mail: LMontgomery@wc.com*

MARK B. JONES
MARK B. JONES ATTORNEY AT LAW
 *1203 Michigan Street*
 *Sandpoint, Id 83864*
 *Phone: (208) 263-0886*
 *E-mail: thessaguy@hotmail.com*

# CERTIFICATE OF COMPLIANCE
# WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Liam J. Montgomery, counsel for Appellant and a member of the Bar of this Court, certify, pursuant to Federal Circuit Rule 32(b)(1), that the attached En Banc Reply Brief of Claimant–Appellant is proportionally spaced, has a typeface of 14 points or more, and contains 6,794 words.

DECEMBER 6, 2021

/s/ *Liam J. Montgomery*

LIAM J. MONTGOMERY

## CERTIFICATE OF SERVICE

I, Liam J. Montgomery, counsel for Appellant and a member of the Bar of this Court, certify that, on December 6, 2021, a copy of the attached En Banc Reply Brief of Claimant–Appellant was filed with the Clerk and served on the parties through the Court's electronic filing system.  In addition, I certify that copies of the En Banc Reply Brief of Claimant–Appellant will be sent to the Clerk and to the following counsel:

William James Grimaldi
Department of Justice, Commercial Litigation Branch, Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044

DECEMBER 6, 2021                    /s/ *Liam J. Montgomery*
                                   LIAM J. MONTGOMERY